No. 25-11578

# In the United States Court of Appeals for the Eleventh Circuit

THE FARMWORKER ASSOCIATION OF FLORIDA, INC.,
ET AL.,
*Plaintiffs-Appellees,*

v.

ATTORNEY GENERAL, STATE OF FLORIDA,
ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:23-cv-22655-RAR

## APPELLANTS' INITIAL BRIEF

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
JASON MUEHLHOFF
NATHAN A. FORRESTER
  *Chief Deputy Solicitors General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*robert.schenck@myfloridalegal.com*

August 15, 2025                    *Counsel for State Defendants-Appellants*

*Farmworker Association of Florida v. Attorney General, State of Florida*
*Eleventh Circuit Case No. 25-11578*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendants certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. ACLU Foundation of Florida, Inc.

2. ACLU Immigrants' Rights Project

3. Amdur, Spencer

4. Americans for Immigrant Justice

5. American Immigration Council

6. Anderson, Anne Janet Hernandez

7. Aragon, Carmenza

8. Archer, Philip

9. Aronberg, David

10. Bakkedahl, Thomas

11. Barlett, Bruce

12. Basford, Larry

13. Brodsky, Ed

14. Campbell, Jack

15. Carrillo, Adrian Jr.

C-1 of 4

*Farmworker Association of Florida v. Attorney General, State of Florida*
*Eleventh Circuit Case No. 25-11578*

16.     Charles, Cassandra

17.     Chavez, Paul

18.     Costello, David

19.     Cox, Nicholas

20.     D'Andrea, Gina

21.     DeSantis, Ronald

22.     DeSousa, Jeffrey

23.     Durrett, John

24.     Forrester, Nathan

25.     Fox, Amira

26.     Gladson, William

27.     Godshall, Amy

28.     Goettel, Katherine

29.     Haas, Brian

30.     Hinojosa, Andrea

31.     Jadwat, Omar

32.     Junaid, Wafa

33.     Kacou, Amien

34.     Kramer, Brian

35.     Larizza, R.J.

*Farmworker Association of Florida v. Attorney General, State of Florida*
*Eleventh Circuit Case No. 25-11578*

36.   LaRocca, Christina

37.   Lopez, Susan

38.   Lozano, Juana

39.   Madden, Ginger

40.   Medrano, Diana

41.   Melo, Daniel

42.   Montanez, Felix

43.   Morales, Reindaldo

44.   Nelson, Melissa

45.   Prada, Mark

46.   Pryor, Harold

47.   Ramirez, Yesica

48.   Rios, Maria

49.   Rossman, Gregg

50.   Ruiz, Hon. Rodolfo II

51.   Rundle, Katherine

52.   Schenck, Robert

53.   Southern Poverty Law Center

54.   State of Florida

55.   Stevens, Caleb

*Farmworker Association of Florida v. Attorney General, State of Florida*
*Eleventh Circuit Case No. 25-11578*

56.    The Farmworker Association of Florida, Inc.

57.    Tilley, Daniel

58.    Uthmeier, James

59.    Ward, Dennis

60.    Wiese, Evelyn

61.    Winger, Emma

62.    Wofsy, Cody

63.    Worrell, Monique

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## ORAL ARGUMENT STATEMENT

Defendants respectfully request oral argument, which will help the Court decide the important legal issues raised by this case. In particular, this case presents critical questions about federalism, preemption, and the enforceability of Florida's Section 787.07, a law designed to combat the horrors of human trafficking.

# TABLE OF CONTENTS

Oral Argument Statement ................................................................................i

Table of Authorities .................................................................................. iiv

Statement of Jurisdiction ............................................................................. 1

Issues Presented............................................................................................ 2

Introduction .................................................................................................. 3

Statement of the Case .................................................................................. 5

      A.     Florida Statutes Section 787.07 ............................................ 5

      B.     Procedural History................................................................. 5

Standard of Review ...................................................................................... 7

Summary of Argument ................................................................................ 7

Argument...................................................................................................... 14

      I.     The district court erred under *Arizona* in granting a preliminary injunction before Florida's law went into effect................... 14

      II.     Plaintiffs have failed to show that they are likely to succeed on the merits. ...................................................................... 23

            A.     Plaintiffs lack standing to attack the human-smuggling statute............................................................. 23

                  1.     The unnamed, individual Plaintiffs lack an imminent injury...................................................... 24

                  2.     The Farmworker Association also lacks an injury. .............................................................. 30

            B.     Plaintiffs lack a cause of action to enforce federal immigration law.............................................................. 35

            C.     Federal immigration law does not preempt the human-smuggling law....................................................... 40

1. Florida's human-smuggling law is not field preempted............................................................. 40

2. Florida's human-smuggling law is not conflict preempted............................................................. 48

III. The remaining equitable factors do not support an injunction................................................................ 50

Conclusion.................................................................................. 51

Certificate of Compliance................................................... 53

Certificate of Service ........................................................... 54

# TABLE OF AUTHORITIES

## Cases

*Aaron Private Clinic Mgmt. LLC v. Berry*,
    912 F.3d 1330 (11th Cir. 2019)...................................................................... 25

*Am. Immigr. Laws. Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) ..................................................................... 17

*Arizona v. United States*,
    567 U.S. 387 (2012)........................................... 3, 4, 8, 9, 13–15, 20, 22, 37, 41, 46, 47

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015).............................................................................. 34, 36–39

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)...................................................................................... 24

*Bankshot Billiards v. City of Ocala*,
    634 F.3d 1340 (11th Cir. 2011)..............................................................9, 10, 23

*Barber v. Gov. of Ala.*,
    73 F.4th 1306 (11th Cir. 2023) ...................................................................... 7

*California v. Zook*,
    336 U.S. 725 (1949).................................................................................3, 49

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011)...................................................................................... 48

*Christian Healthcare Ctrs. v. Nessel*,
    117 F.4th 826 (6th Cir. 2024) ....................................................................... 26

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018)......................................................................23, 41

*City of Miami Gardens v. Wells Fargo & Co.*,
    931 F.3d 1274 (11th Cir. 2019)...................................................................... 25

*City of South Miami v. Governor of Fla.*,
    65 F.4th 631 (11th Cir. 2023) ...................................................................28, 30, 32

*Clapper v. Amnesty Int'l,*
568 U.S. 398 (2013)..................................................................23, 28, 31

*Club Madonna v. City of Miami Beach,*
924 F.3d 1370 (11th Cir. 2019)....................................................21, 28

*Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman,*
272 F. Supp. 3d 554 (S.D.N.Y. 2017).........................................36, 38

*Corey v. Rockdale Cnty.,*
689 F. Supp. 3d 1251 (N.D. Ga. 2023) ............................................. 35

*Cruz v. Abbott,*
849 F.3d 594 (5th Cir. 2017).......................................................19, 26

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014) ............................................................................... 13

*Dana's R.R. Supply v. Att'y Gen.,*
807 F.3d 1235 (11th Cir. 2015)........................................................ 23

*Davis v. Passman,*
442 U.S. 228 (1979)........................................................................... 34

*DeCanas v. Bica,*
424 U.S. 351 (1976)...............................................................40, 42, 47

*Downtown Soup Kitchen v. Mun. of Anchorage,*
576 F. Supp. 3d 636 (D. Alaska 2021)........................................27, 29

*Dream Defenders v. Gov. of the State of Fla. (Dream Defenders I),*
57 F.4th 879 (11th Cir. 2023) .......................................................... 22

*Dream Defenders v. Gov. of the State of Fla. (Dream Defenders II),*
119 F.4th 872 (11th Cir. 2024) ........................................................ 26

*Earth Trades, Inc. v. T & G Corp.,*
108 So. 3d 580 (Fla. 2013)................................................................ 16

*English v. Gen. Elec. Co.,*
496 U.S. 72 (1990)............................................................................. 43

v

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
260 F.3d 1285 (11th Cir. 2001)............................................................. 20

*Ex parte Gouthro*,
296 F. 506 (E.D. Mich. 1924)...........................................................21, 22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................................10, 32

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)............................................................................. 43

*Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*,
691 F.3d 1250 (11th Cir. 2012)............................... 4, 9, 11–13, 22, 36, 43–49

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)........................................................................... 38

*Grupo Mexicano de Desarrollo S.A., v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999)........................................................................... 39

*Henry v. Att'y Gen., Ala.*,
45 F.4th 1272 (11th Cir. 2022) ............................................................ 28

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985)........................................................................... 41

*Hines v. Davidowitz*,
312 U.S. 52 (1941)............................................................................. 47

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)..........................................................................28, 29

*In re Areguillin*,
17 I. & N. Dec. 308 (BIA 1980)............................................................ 21

*In re F*,
1 I. & N. Dec. 90 (BIA 1941)............................................................... 21

*In re G*,
3 I. & N. Dec. 136 (BIA 1948)..........................................................16, 21

*In re Quilantan,*
  25 I. & N. Dec. 285 (BIA 2010)....................................................................... 16

*In re S,*
  9 I. & N. Dec. 599 (BIA 1962)..................................................................16, 21

*Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.,*
  16 F.3d 198 (7th Cir. 1994) ........................................................................... 36

*Jacobson v. Fla. Sec'y of State,*
  974 F.3d 1236 (11th Cir. 2020)...............................................................23, 33

*Jefferson Cnty. v. Acker,*
  210 F.3d 1317 (11th Cir. 2000)...............................................................12, 45

*June Med. Servs. v. Russo,*
  591 U.S. 299 (2020)........................................................................................ 39

*Kansas v. Garcia,*
  589 U.S. 191 (2020)............................................3, 5, 12, 13, 40–43, 45–47, 49

*KH Outdoor, LLC v. Clay Cnty.,*
  482 F.3d 1299 (11th Cir. 2007)..................................................................... 31

*Lab'y Corp. of Am. v. Davis,*
  339 So. 3d 318 (Fla. 2022).............................................................................. 20

*Lawson v. Hill,*
  368 F.3d 955 (7th Cir. 2004) ......................................................................... 29

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992).................................................................................24, 33, 34

*Maverick Media Grp., Inc. v. Hillsborough Cnty.,*
  528 F.3d 817 (11th Cir. 2008)....................................................................... 31

*McDonald's Corp. v. Robertson,*
  147 F.3d 1301 (11th Cir. 1998)....................................................................... 7

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
  774 F.3d 895 (6th Cir. 2014).......................................................................... 39

*Murthy v. Missouri,*
603 U.S. 43 (2024)................................................................24, 25

*N.J. Bankers Assoc. v. Att'y Gen. N.J.,*
49 F.4th 849 (3d Cir. 2022).................................................... 26

*N.Y. State Dep't of Soc. Servs. v. Dublino,*
413 U.S. 405 (1973).................................................................. 47

*Nken v. Holder,*
556 U.S. 418 (2009)................................................................... 7

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022).................................................................. 46

*Oneok, Inc. v. Learjet, Inc.,*
575 U.S. 373 (2015)...........................................12, 40, 42, 43, 45

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.,*
641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................. 31

*Planned Parenthood Greater Nw. v. Labrador,*
122 F.4th 825 (9th Cir. 2024) ...........................................26, 29

*Plyler v. Doe,*
457 U.S. 202 (1982)................................................................... 7

*Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,*
40 F.3d 1454 (3d Cir. 1994) ................................................... 29

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.,*
485 U.S. 495 (1988).................................................................. 46

*Safe Sts. All. v. Hickenlooper,*
859 F.3d 865 (10th Cir. 2017)...........................................36, 38

*Scott v. United States,*
890 F.3d 1239 (11th Cir. 2018)............................................... 30

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020).................................................................. 36

*Seminole Tribe of Fla. v. Florida,*
  517 U.S. 44 (1996) ................................................................... 35

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) ............................................... 7

*State ex rel. Shevin v. Metz Const. Co.,*
  285 So. 2d 598 (Fla. 1973) ............................................... 8, 22

*State v. Yanes-Blanco,*
  401 So. 3d 592 (5th DCA 2025) ............................... 8, 19, 26

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .......................................... 23, 33, 34

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ........................................ 24, 26, 28, 29

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ....................................................... 13, 49

*Tsuji v. Fleet,*
  366 So. 3d 1020 (Fla. 2023) ................................................. 15

*United States v. Cox,*
  342 F.2d 167 (5th Cir. 1965) ................................................. 44

*United States v. Gaubert,*
  499 U.S. 315 (1991) ......................................................... 44, 45

*United States v. Smith,*
  62 F.2d 808 (7th Cir. 1933) ................................................. 21

*United States v. Southro,*
  8 F.2d 1023 (6th Cir. 1925) ................................................. 21

*United States v. Texas,*
  97 F.4th 268 (5th Cir. 2024) ........................................... 39, 50

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................. 38

*Va. Off. for Prot. & Advoc. v. Stewart*,
  563 U.S. 247 (2011)..................................................................................... 36

*Virginia v. Hicks*,
  539 U.S. 113 (2003)..................................................................................... 50

*Wachovia Bank N.A. v. United States*,
  455 F.3d 1261 (11th Cir. 2006)................................................................... 20

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)..................................................................................... 23

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
  900 F.3d 250 (6th Cir. 2018)....................................................................... 25

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
  59 F.4th 1124 (11th Cir. 2023) ...............................................................26–28

*Wilson v. State Bar of Ga.*,
  132 F.3d 1422 (11th Cir. 1998)........................................................28, 30, 34

*Winsness v. Yocom*,
  433 F.3d 727 (10th Cir. 2006)..................................................................... 29

*Zyla Life Scis. v. Wells Pharma of Houston*,
  134 F.4th 326 (5th Cir. 2025) ................................................................. 4, 49

## Statutory Provisions

8 U.S.C. § 1103..................................................................................................... 35

8 U.S.C. § 1225.......................................................................8, 9, 14, 16, 17, 19

8 U.S.C. § 1229..................................................................................................... 17

8 U.S.C. § 1304..................................................................................................... 47

8 U.S.C. § 1324..................................................................................................... 24

8 U.S.C. § 1329..................................................................................................... 35

8 U.S.C. § 1357..................................................................................................... 48

8 U.S.C. §§ 1301–06 ............................................................................................ 46

8 U.S.C. §§ 1324, 1326, 1330 ........................................................................ 35, 46

18 U.S.C. §§ 1961, 1962, 1964 ............................................................................ 36

19 U.S.C. § 1459 ............................................................... 4, 8, 11, 16, 42

28 U.S.C. § 1292 ................................................................................................... 1

28 U.S.C. § 1331 ................................................................................................... 1

Fla. Laws ch. 2023-40 (May 10, 2023) ............................................................... 31

Fla. Stat. § 787.07 ........................................................ 2, 3, 5, 7, 8, 14, 16, 31

**Regulations**

8 C.F.R. § 235.2 .................................................................................................... 18

**Other Authorities**

*AG Moody and Law Enforcement Leaders Sound the Alarm as Deadly Fentanyl Catapults Panhandle Counties to Top Spot for Per Capita Opioid Death Rate in Florida*, Office of Attorney General (Aug. 2, 2023) ...................................................................... 50

*Caleb Nelson, "Standing" and Remedial Rig*hts in Administrative Law, 105 Va. L. Rev. 703 (2019) ................................................................................................................ 39

Dep't of Homeland Security, *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024) ..................................... 50

*Frontline Against Fentanyl*, U.S. Customs & Border Prot. (Aug. 06, 2025) ...................... 44

Hum. Smuggling & Trafficking Ctr., *Domestic Human Trafficking – An Internal Issue –* (2008) ................................................................................................................ 44

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997) ........................................................ 17, 18

*Memorandum of Agreement*, ICE ........................................................................... 48

Ruth Ellen Wasem et al., Cong. Rsch. Serv., RL32399, *Border Security: Inspections Practices, Policies, and Issues* (2004)...................................................................... 18

*Subcommittee on Border Security and Enforcement Demands Answers in Phase Two of Mayorkas Investigation*, House Comm. on Homeland Sec. (July 13, 2023) .................................. 50

*The Oxford English Dictionary* (2d ed. 1989) ...................................................15, 16

USA Facts, *Are fentanyl overdose deaths rising in the US?* (last updated Sept. 27, 2023)..... 50

USCIS Policy Manual, U.S. Citizenship and Immig. Servs., *Chapter 2— Eligibility Requirements*....................................................................................................17, 18

*Webster's New International Dictionary* (2d ed. 1954) ............................................. 15

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. But the district court lacked jurisdiction under Article III because Plaintiffs lack standing. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

Florida amended Section 787.07, Florida Statutes, to guard Floridians from the horrors of human smuggling and the damage that accompanies it, such as fentanyl trafficking and gang violence. Florida also tailored its law to avoid any conflict with federal law by criminalizing the transport of only those whose crimes the federal government has no idea about—those not inspected by federal authorities. Even so, the district court granted a preliminary injunction against Defendants from enforcing that law because the district court found that law was likely preempted. The issues on appeal are:

1.    Whether Plaintiffs are likely to show that they have standing.

2.    Whether Plaintiffs are likely to show that they have a cause of action to enforce federal immigration law.

3.    Whether Plaintiffs are likely to show that Florida's law is (i) field preempted by federal law or (ii) conflict preempted for interfering with the federal government's prosecutorial discretion.

4.    Whether Plaintiffs have clearly established that the balance of the equities favors an injunction and that the public interest favors an injunction.

**INTRODUCTION**

The United States Code is a behemoth that contains thousands of federal crimes. If every one of those crimes preempted parallel state laws—from murder to rape to child pornography—then preemption would leave nothing for the states to govern. Federal supremacy does not go so far. "[T]he historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress," and that is no less true for state laws impacting immigrants. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). As recently as five years ago, the Supreme Court reaffirmed the century-long principle that "there is no conflict in terms" when a "state statute makes federal law its own," *California v. Zook*, 336 U.S. 725, 735 (1949), in an immigration case. *See Garcia*, 589 U.S. at 212 (confirming that mere "overlap" in criminal laws does not support preemption.).

In 2023, Florida updated its human-smuggling law. That law criminalizes anyone (alien or citizen) for transporting into Florida any person (again, alien or citizen) who illegally entered the country and has not been "inspected by" the federal government. Fla. Stat. § 787.07(1). To comply with Florida's law, illegal entrants simply need to be "inspected"—which they can easily do by alerting federal authorities of their presence and triggering an initial determination of their admissibility. That law operates like little more than a reporting requirement.

3

Yet the district court preliminarily enjoined Defendants from enforcing Florida's human-smuggling law on a supercharged theory of preemption. That was wrong. From the start, the district court "inappropriate[ly]" acted "without the benefit of a definitive interpretation from the state courts." *Arizona*, 567 U.S. at 415. Plaintiffs also lack standing and a cause of action to enforce federal immigration law. On the merits, they are similarly wrong that federal law preempts Florida's human-smuggling law. Nothing in federal law shows that Congress, knowing its "limited resources," unmistakably ordained that it does not "welcome[] state aid in enforcing shared legal norms." *Zyla Life Scis. v. Wells Pharma of Houston*, 134 F.4th 326, 334 (5th Cir. 2025).

In lieu of applying these first principles, the district court relied on *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012). That case hardly applies here. At the heart of *Georgia Latino* laid a concern about federal enforcement discretion over federal immigration crimes. *Id.* at 1257–58. But Florida's law does not turn on immigration status. Not only that, Florida's law bars the transport of only uninspected people, whose crimes of unlawful entry, by definition, the federal government is unaware of. The federal government does not exercise discretion over crimes it does not know exist, much less bar the States from acting. At worst, Florida has copied a federal *non-immigration* crime that this Court has never held creates preemption. 19 U.S.C. § 1459 (criminalizing uninspected entry by any person). To reach its result, then, the district court stretched *Georgia Latino* to where the Supreme Court has forbidden:

4

drawing preemption from mere "overlap" in criminal laws, *Garcia*, 589 U.S. at 212, and from rogue "judicial policy preference," *id.* at 202.

This Court should vacate that injunction or at least certify a question of state law.

## STATEMENT OF THE CASE

### A.   Florida Statutes Section 787.07

In May 2023, Florida passed SB 1718. *See* Ch. 2023-40, Laws of Fla. One part of that law amended an existing criminal provision, Section 787.07, Florida Statutes, which is Florida's "[h]uman [s]muggling" statute. As updated, Section 787.07 makes it a crime for "a person" to "knowingly and willfully transport[] into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law," if the person being transported "has not been inspected by the Federal Government since his or her unlawful entry from another country." Fla. Stat. § 787.07(1).

### B.   Procedural History

In July 2023, Plaintiffs sued to enjoin the enforcement of Florida's human-smuggling law. DE1. Plaintiffs are nine individuals who sought to proceed anonymously and one nonprofit organization. DE1 ¶¶ 127–39. The district court denied Plaintiffs' motion to proceed anonymously, DE86, resulting in two Plaintiffs dropping out of the case, DE90; DE91, while the other seven revealed their identities, DE93. The Farmworker Association of Florida is a nonprofit organization headquartered in Apopka, Florida. DE1 ¶¶ 14. The Farmworker Association has individual members, including immigrants of various immigration statuses. DE1 ¶¶ 18–21.

Plaintiffs sued Governor Ron DeSantis, the Florida Attorney General, the Florida Statewide Prosecutor, and Florida's 20 state attorneys. DE1 ¶¶ 60–63. They argue that federal law preempts Florida's human-smuggling law and that Florida's law is unconstitutionally vague. DE1 ¶¶ 127–50. The Governor moved to dismiss himself as an improper defendant, and Plaintiffs moved for a preliminary injunction against Defendants. DE24. The Court granted both motions after a hearing. DE99.[1] The district court found standing against the Attorney General and Statewide Prosecutor for three individual Plaintiffs and the Farmworker Association and held that the human-smuggling law was likely field and conflict preempted by federal immigration law. DE99 at 5–17, 21–29, 38–39. The district court rejected Plaintiffs' argument, however, that Florida's law was unconstitutionally vague. DE99 at 17–21. In a later order, the district court found standing for two of remaining individual Plaintiffs, and found that two others did not demonstrate their standing. DE137 at 23. In sum, the district court found standing for five individual Plaintiffs and the Farmworker Association and issued a preliminary injunction against enforcement of Florida's human-smuggling law as to them.

Florida's Attorney General and Statewide Prosecutor appealed. DE142.

---

[1] The state attorney Defendants agreed to be "bound the terms of any injunction" in exchange for a stay of deadlines in this case. DE42 at 4.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) a substantial risk of irreparable injury absent injunctive relief; (3) an injunction would not cause substantial harm to other interested persons; and (4) the public interest favors an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites," *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (cleaned up).

This Court reviews the district court's decision to grant or deny "a preliminary injunction for abuse of discretion," reviewing factual findings "for clear error and legal conclusions *de novo*." *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023).

## SUMMARY OF ARGUMENT

Plaintiffs challenge, as preempted by federal law, Florida's attempt in Section 787.07 to protect its citizens from the effects of human smuggling. Ignoring the "discernible impact on traditional state concerns" from "the influx of persons entering the United States against federal law," *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982), the district court preempted Florida's human-smuggling statute. It relied on this Court's precedent interpreting federal immigration law, even though the most on-point federal statute is a customs statute that criminalizes uninspected entry by citizens and aliens. *See* 19 U.S.C.

§ 1459. And this Court has never held that the customs statute creates preemption. The district court was wrong for four reasons, any one of which warrants reversal. In overreading the scope of Florida's law, the district court unnecessary increased the potential for state law to "conflict with federal law," rendering a pre-enforcement injunction "inappropriate." *Arizona v. United States*, 567 U.S. 387, 415 (2012). Beyond that error, Plaintiffs lack standing, lack a cause of action, and failed to show that Florida's law is inconsistent with federal law. This Court should vacate that injunction and reverse.

**I.** For starters, the district court misread the statute, an error that warped its standing and merits analysis.

The district court's key error was reading the term "inspected" too narrowly. *See* Fla. Stat. § 787.07(1) (criminalizing the transport of those who have "not been inspected by the Federal Government since his or her unlawful entry"). That term serves to limit the scope of Florida's statute because it prohibits the transportation of only uninspected people. Yet the district court concluded that inspect entailed a careful and complete examination. That cannot be right. The plain meaning of "inspected" denotes federal authorities' initial determination of whether a person's admissibility is "clear and beyond" "doubt." 8 U.S.C. § 1225(b)(2)(A). That is how state courts would interpret that term, especially against the backdrop of preemption concerns—the critical inquiry for a federal court interpreting state law. *See State v. Yanes-Blanco*, 401 So. 3d 592, 598 (5th DCA 2025) (relying on federal law to interpret a term drawn from a federal source); *see*

8

*also State ex rel. Shevin v. Metz Const. Co.*, 285 So. 2d 598, 600 (Fla. 1973) (state courts must "avoid" readings that could in any way "cast[] grave doubts upon the statute's validity"). That resolves both standing and the merits. On standing, Plaintiffs vaguely allege that they want to drive individuals where the federal government has already apparently made an initial determination on admissibility and requested further information. That renders those individuals inspected. On the merits, this reading avoids conflict with immigration law as this Court saw it in *Georgia Latino*, which was overwhelmingly concerned with federal officials' enforcement discretion. Where federal authorities become aware of an alien's unlawful entry, they have no discretion—because as soon as that happens, federal authorities must inspect that alien, and for persons subject to Florida's law, an inadmissibility determination would be near instant. *See* 8 U.S.C. § 1225(a)(3). Because that "fair[] reading" of Florida's law would avoid conflicts, any injunction was "inappropriate" before state courts can weigh in on the proper interpretation of that term. *Arizona*, 567 U.S. at 415. If any doubt remains, this Court should certify a question to the Florida Supreme Court.

**II.** Plaintiffs are unlikely to succeed on the merits of their claims.

**A.** Plaintiffs lack standing. They have failed to show the "constitutionally protected conduct" necessary for pre-enforcement review under binding precedent. *See Bankshot Billiards v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011). The conduct they seek to engage in—transporting lawbreakers—is not "constitutionally protected" in the same way that the First Amendment protects speech or the Second Amendment

9

protects the right to bear arms to justify pre-enforcement review. *See id.* (finding conduct not "constitutionally protected" in vagueness claim under the Due Process Clause). At best, Plaintiffs claim that Florida's law is preempted by a federal *statute* (which also prohibits their conduct). But their preemption claim does not render their conduct "constitutionally protected." *Id.*

Nor can Plaintiffs satisfy the other elements of a pre-enforcement preemption challenge, as they have still failed to show sufficient injury. The five individual Plaintiffs have not even alleged facts showing that the statute applies to them because they only plan to transport inspected individuals. That conduct does not violate the statute and the Attorney General has disclaimed that the statute reaches their conduct.

The Farmworker Association similarly lacks standing. That organization cannot rely on an injury to itself through lost membership dues or a diversion of resources. Its claim of lost membership is speculative and insufficiently concrete. And its diversion-of-resources theory is no longer viable after *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024) ("[A]n organization . . . cannot spend its way into standing[.]"). As for the Association's reliance on the standing of its members, it too has failed to allege any imminent injury. Those members do not have concrete plans to violate the statute, so this argument fails for the same reason as the individual Plaintiffs.

**B.** Plaintiffs further lack a cause of action to enforce federal immigration law. Though Florida's law does not operate in the immigration realm, that federal law would not give Plaintiffs a cause of action to sue Florida in any event. Congress controls

10

whether plaintiffs can sue to enforce a statute, and nothing in the Immigration and Nationality Act (INA) confers Plaintiffs this right. When the "fairest reading" of a federal statute shows that Congress wanted to preclude private enforcement, courts cannot sidestep that limitation by pointing to historic notions of equity. That is the case here. The relevant portions of the INA vest enforcement solely in the U.S. Attorneys. The topics of criminal and immigration law, areas that both federal and state governments have historically regulated in an exclusive capacity, bolster that conclusion. Even more so for the Association, which seeks to raise the causes of action of third parties. Federal courts created these equitable causes of action to allow individuals to preemptively assert a legal defense (like preemption) to a state's enforcement proceeding. That way, those individuals would not have to wait to raise that defense in an enforcement proceeding. But the Association is not that type of plaintiff.

**C.** On the merits, Florida's law is not field or conflict preempted under the INA. First, Florida's human-smuggling law does not act in a preempted field. Nothing shows that Congress preempted the field of transporting uninspected individuals, nor have Plaintiffs pressed any such argument. While federal law criminalizes the uninspected entry of any person, 19 U.S.C. § 1459, this Court has never found field or conflict preemption from that provision.

Nor does Florida's law fall into the field outlined by *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012). Relying on that case, the district court claimed that Florida's law falls within the field of prohibitions on the

11

transportation of unlawfully present aliens. It does not. Florida's human-smuggling law prohibits the transportation of any uninspected *individual* and does not turn on immigration status or lawful presence. State laws only fall within a federal field when they are "aimed directly at" the federal field "as defined by [] precedent[]." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). Florida has meticulously crafted its human-smuggling law to avoid the preempted field as *Georgia Latino* defined it. That panel believed that Congress granted the Executive Branch exclusive "enforcement" "discretion" over the INA's criminal provisions. 691 F.3d at 1265–66. Because the federal government is unaware of the unlawful entry of uninspected individuals, it has no enforcement discretion over related immigration offenses of those individuals. Florida's law thus cannot interfere with any discretion.

Because Florida's law does not operate in that field, the district court had to stretch the flawed logic in *Georgia Latino* to preempt Florida's law. But extending *Georgia Latino* even by a "micron" was improper. *See Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). Later Supreme Court precedent fatally undermined this Court's erroneous opinion. In *Georgia Latino*, the Court relied on the fact that Congress criminalized similar behavior through the criminal transportation provision of the INA. But as the Supreme Court explained in a later immigration-preemption case, an "overlap" in criminal prohibitions does not by itself equal preemption. *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). The INA offers no other evidence that Congress shared the opinion's restrictive vision of state authority. To make that holding, this Court had to overcome the

presumption against preemption, which "has greatest force when Congress legislates in an area traditionally governed by the States' police powers," as here. *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014).

Second, Florida's human-smuggling law is not conflict preempted. The district court again relied on *Georgia Latino*, which itself found preemptive intent lurking in the prosecutorial discretion inherent in federal immigration crimes. *Ga. Latino*, 691 F.3d at 1265–66. Yet again, Florida's law avoids interfering with federal enforcement discretion in any way and applies to aliens and citizens alike. This Court should not extend *Georgia Latino*'s conflict preemption holding either, because the mere "overlap" in state and federal criminal law "does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 211.

**III.** Plaintiffs have also failed to meet the remaining requirements for preliminary injunctive relief. Any harm done to Plaintiffs is outweighed by the harm done to the State of Florida and the public interest from the "State [being] enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025). The balance of the equities strongly favors the State's ability to protect its citizens.

## ARGUMENT

**I.    The district court erred under *Arizona* in granting a preliminary injunction before Florida's law went into effect.**

The district court granted a preliminary injunction based on its misreading of Florida's human-smuggling law "without the benefit of a definitive interpretation from the state courts." *Arizona v. United States*, 567 U.S. 387, 415 (2012). That law criminalizes the act of "knowingly and willfully transport[ing] into" Florida "an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry." Fla. Stat. § 787.07(1). The district court narrowly interpreted the term "inspected" to require that federal officials look or examine an alien's application "carefully" or "closely." DE99 at 14–15 & n.5. But the term "inspected" refers to federal authorities' initial investigation into a person's admissibility, which concludes once an inspector determines that a person is not "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A).

The district court's improper reading of "inspected" infected its analysis on both standing and the merits. On standing, the district court found that the statute arguably covered Plaintiffs' conduct, creating standing. DE99 at 13–15. Yet the unlawfully present aliens that Plaintiffs want to drive have already identified themselves to federal authorities, and those authorities, in response, have called for further screening related to their status. That renders any initial inspection complete. On the merits, the district

14

court determined that Florida's law was preempted because it interferes with federal enforcement discretion over immigration crimes. DE99 at 21–29. If the term "inspected" applies only where the federal government is unaware of a person's potential inadmissibility, then there is no conflict with federal enforcement discretion because discretion implies knowledge. *Infra* 44.

That error requires vacatur or at least certification of a state-law question. In overly construing the term "inspected," the district court expanded the statute's reach "even before the law ha[d] gone into effect." *Arizona*, 567 U.S. at 415. The district court sought "out conflicts between state and federal regulation where none clearly exists" in the face of "basic uncertainty about what the law means." *Id.* That was "inappropriate" and requires vacatur of the injunction, *id.*, not only because Florida's law "could be read to avoid [preemptive] concerns," *id.* at 415 ("presum[ing] that" state courts will avoid conflicts with federal law), but because the Florida courts would do so based on the statute's plain meaning. In the alternative, this Court should certify a question to the Florida Supreme Court.

Properly read, a person is "inspected" where the federal government has initially inquired or investigated a person's potential inadmissibility. That meaning comports with dictionary definitions, the statutory title, and federal law that serves as context for Florida's statute. To "inspect" is defined as "to examine" or "to look at" something. Inspect, *Webster's New International Dictionary* 1286 (2d ed. 1954); *Tsuji v. Fleet*, 366 So. 3d 1020, 1028 (Fla. 2023) (Florida courts "often look to contemporaneous dictionaries for

15

evidence of [the ordinary] meaning" of statutory terms). And "to examine" means "[t]o inquire" into or to "investigate (a question or subject)." Examine, 5 *The Oxford English Dictionary* 488 (2d ed. 1989); *see also* Look, *Webster's New International Dictionary* 1457 (defining "to look" as "to see," "observe," or "perceive," but that as "commonly used," "attention is not emphasized"). For the lawfulness of a person's entry into the country, the relevant inquiry is "the right of" that person to be in the country—their admissibility. *In re S*, 9 I. & N. Dec. 599, 600 (BIA 1962).

The context of Florida's law confirms the focus on an initial inquiry of admissibility. The statute's title—"[h]uman smuggling"—confirms the clandestine nature of the crime and thus colors the meaning of "inspected" to turn on the federal government's lack of knowledge about that person's entry. Fla. Stat. § 787.07; Smuggle, 15 *The Oxford English Dictionary* (2d ed. 1989) ("to convey . . . in a stealthy and clandestine manner"); *Earth Trades, Inc. v. T & G Corp.*, 108 So. 3d 580, 585 (Fla. 2013) (relying on statutory title to interpret text). The statute's evidentiary presumption provides further support. Under that provision, a person who "willfully present[s] false identification" to law enforcement during a human-smuggling investigation presumptively knows that his passengers are uninspected. Fla. Stat. § 787.07(6). That presumption again hones the focus of inspection on the federal government's inquiry of admissibility—because false identification naturally shields someone's potential inadmissibility.

Federal law accords with that understanding. Even without a decision on admission, federal law considers persons as inspected if they have interacted with federal

officials about their admissibility. *See, e.g.*, 8 U.S.C. § 1225(a)(2) (discussing referring an alien for further proceedings "[u]pon inspection"); 19 U.S.C. § 1459(a), (d) (requiring individuals arriving in the United States to "present" themselves "for inspection"); *In re Quilantan*, 25 I. & N. Dec. 285, 293 (BIA 2010) (defining "inspected and *admitted*" (emphasis added)); *In re G*, 3 I. & N. Dec. 136, 138 (BIA 1948). In 1996, Congress focused the "inspection process in order to expedite the removal from the United States of" those who have no right to be here. *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000). Congress also required all aliens "who ha[ve] not been" granted legal admission to the United States to undergo inspection, including those found "present in[side] the United States." 8 U.S.C. § 1225(a)(1), (a)(3). Through an inspection, a federal officer determines whether an alien is "clearly and beyond a doubt entitled to be admitted" to the country at the time of inspection. 8 U.S.C. § 1225(b)(2)(A).[2] But an inspection does not require a final determination on admissibility, *see id.*, a decision reserved for asylum interviews or removal proceedings, 8 U.S.C. §§ 1225(b)(1)(B), 1229a(a)(1). It is instead a cursory examination that occurs "in a very short period of time."[3] An inspection thus produces an initial determination on admissibility, which dictates what federal authorities should do next.

---

[2] *See also* USCIS Policy Manual, U.S. Citizenship and Immig. Servs., *Chapter 2—Eligibility Requirements*, https://tinyurl.com/4nwh5mrp (last updated Aug. 8, 2025).

[3] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10318 (Mar. 6, 1997).

There are generally three outcomes to inspection. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he is admitted. 8 U.S.C. § 1225(b)(2)(A). If an alien is not entitled to be admitted, he is placed in removal proceedings. *Id.* Finally, immigration officials might determine that they have insufficient information to make a determination but that the alien might be able to overcome inadmissibility, warranting another, more detailed inspection.[4] At the border, for example, an officer conducts a preliminary inspection (sometimes called a primary inspection) consisting of "a brief interview" that "usually last[s] no longer than a minute."[5] But if further questions are raised, that officer will direct the person to another area for another official to conduct a secondary inspection to examine the person again in more depth.[6] Another possibility is "deferred inspection," where an alien is found potentially "inadmissible during a preliminary inspection," but "the alien would likely be able to overcome the identified inadmissibility by obtaining a waiver or additional evidence."[7] Aliens subject to a deferred inspection are "inspected and paroled" and let into the country (but not legally admitted), for the purposes of an additional, deferred inspection.[8] In that case, an initial

---

[4] *Id.* at 10318.

[5] Ruth Ellen Wasem et al., Cong. Rsch. Serv., RL32399, *Border Security: Inspections Practices, Policies, and Issues* 10 (2004), https://tinyurl.com/92z739wa.

[6] *Id.* at 11.

[7] USCIS Policy Manual, *supra* note 2.

[8] *Id.* (noting that parole may be granted only if "[a]n immigration officer inspected" an alien "without determining whether they may be admitted"); *see also* 8 C.F.R.

18

inspection has shown that an alien is not clearly admissible, but the Executive is exercising its discretion to wait and see if that alien can receive a waiver of inadmissibility or overcome this determination. Those outcomes mark the latest time an inspection would be complete.

And Florida courts would almost certainly rely on federal law to elucidate the meaning of "inspected." *See State v. Yanes-Blanco*, 401 So. 3d 592, 598 (5th DCA 2025). In *Yanes-Blanco*, Florida's Fifth District Court of Appeal analyzed a prior version of the same human-smuggling statute, which criminalized the transport into Florida of an individual who "is illegally entering the United States." *Id.* at 597. That court, in interpreting what "is illegally entering" meant, relied heavily on the "context" of federal immigration law. *Id.* at 598. That "context," "as more fully discussed in [the] well-reasoned concurrence" in *Yanes-Blanco*, revealed that the Florida Legislature incorporated federal understandings that "an illegal alien's entry into the United States is a continuous process." *Id.*; *see also id.* at 601–03 (Boatwright, J., concurring) (explaining federal approach). As that concurrence explained, "'Florida courts often look to federal decisions as a guide to interpreting state statutes' when dealing with similar federal laws," and so those opinions informed the meaning of state law. *Id.* at 601 (Boatwright, J., concurring); *see also Cruz v. Abbott*, 849 F.3d 594, 600 (5th Cir. 2017) (using federal immigration

---

§ 235.2 (noting that an alien subject to deferred inspection is paroled pending a "further examination").

decisions in interpreting state law). The same is true of Florida's updated human-smuggling statute, which similarly borrows the term "inspected" from federal immigration law.

In sum, the scope of federal inspections informs the meaning of Florida's law. If federal authorities have initially determined a person's admissibility under the low statutory standard—that an alien "is not clearly and beyond a doubt entitled to be admitted," 8 U.S.C. § 1225(b)(2)(A)—then that person is inspected under Florida's law.

The district court, however, disputed that there was any support for this reading of "inspected." To the district court, the "available definitions" of "inspect" signify an inquiry into the "careful[ness]" of the actions of immigration officials. DE99 at 13–15. That defies basic interpretative principles of Florida law, and the district court cited not one Florida case for its construction of Florida law. *See id.* The district court instead depended on its own view of the "plain meaning of the word 'inspect,'" divorced from any context that Florida courts would view as critical. *Id.* The district court's job was to "decide the case the way it appears the state's highest court would," which required it to "adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001).

It failed to do so. As the Florida Supreme Court recently observed, "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022). "Context

20

is a *primary determinant* of meaning" because that context imparts flavor onto the words that the Legislature used. *Id.* (emphasis added). And "what [words] convey, in their context, is what the text [of a statute] means." *Id.* at 324. In Florida, as elsewhere, "context is king." *Wachovia Bank N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006).[9]

In looking to dictionaries, the district court tightened the requirements of an inspection by pointing to definitions like "examine [a person] officially" or "look[] [at a person] carefully." DE99 at 13. Yet the first definition helps Defendants and federal law rejects the second. The modifier "officially" zeroes in on what is required of an examination as an official matter—and federal law at most requires an initial admissibility determination. As for the district court's scrutiny of the carefulness of an inspection, federal law swears off any such inquiry. Courts do not inquire into whether an "inspector has not made as complete or successful an inspection as he could or should have made." *In re F*, 1 I. & N. Dec. 90, 91 (BIA 1941). What matters is "the opportunity to check the right of the [person] to enter the United States," *In re S*, 9 I. & N. Dec. at 600. Even if not a single word exchanges between inspector and subject, inspection

_____

[9] While the Supreme Court in *Arizona* admonished federal courts not to construe state statutes "in a way that creates a conflict with federal law," 567 U.S. at 415, the district court believed that rule inapplicable to standing, DE99 at 12. Not so. While courts "must not confuse weakness on the merits with absence of Article III standing," the interpretation of laws for standing "often turns on the nature and source of the claim asserted," requiring a "peek at the merits." *Club Madonna v. City of Miami Beach*, 924 F.3d 1370, 1382 (11th Cir. 2019). But even if the district court were right, the district court erred by carrying its overly broad interpretation into the merits.

occurs. *In re G*, 3 I. & N. Dec. at 138.[10] That emphasis makes sense. Otherwise, courts would enter the business of questioning the broad "discretion vested in immigration inspectors as to the nature and extent of the inspection required" and second-guess the "legal presumption" that inspectors "properly performed the[ir] duties." *Gouthro*, 296 F. at 511.

Those principles resolve this case. Even if the statutory context did not conclusively establish that "inspected" refers to awareness of federal officials, the context at the very least makes that a "fair[]" reading of Florida's law, which Florida courts would presumptively adopt to "avoid" any preemption concerns. *Arizona*, 567 U.S. at 413–15. In light of *Georgia Latino*, Florida courts would not read state statutes to butt heads with federal enforcement discretion because it could "cast[] grave doubts upon the statute's validity." *State ex rel. Shevin v. Metz Const. Co.*, 285 So. 2d 598, 600 (Fla. 1973).

If the Court were to question that approach, it should certify this question to the Florida Supreme Court. *See Dream Defenders v. Gov. of the State of Fla. (Dream Defenders I)*, 57 F.4th 879, 893 (11th Cir. 2023). In a circumstance like this, where "[t]he proper interpretation of the statutory definition is a novel issue of state law," the federal courts "should not attempt to decide the constitutional issues presented . . . without first

---

[10] *See also, e.g.*, *In re Areguillin*, 17 I. & N. Dec. 308, 309–10 (BIA 1980); *Ex parte Gouthro*, 296 F. 506, 511 (E.D. Mich. 1924) (deeming an inspection's "complete[ness] or successful[ness]" as irrelevant to whether an alien is inspected); *United States v. Southro*, 8 F.2d 1023, 1023 (6th Cir. 1925) (adopting analysis of *Gouthro*); *United States v. Smith*, 62 F.2d 808, 815 & n.6 (7th Cir. 1933) (same).

having the [Florida] Supreme Court's interpretation of key provisions of the statute." *Id.* That certification would "avoid the friction" associated with "address[ing] the merits of the plaintiffs' pre-enforcement constitutional challenge without first giving the Florida Supreme Court an opportunity to interpret its State's law" and affords the proper "respect for the place of the States in our federal system." *Id.* at 893–94.

## II.     PLAINTIFFS HAVE FAILED TO SHOW THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     Plaintiffs lack standing to attack the human-smuggling statute.

To have standing, plaintiffs must show injury in fact, traceability, and redressability. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The injury must be "concrete and particularized" and "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Mere *"possible* future injury" is not enough. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013).

As a threshold matter, Plaintiffs' pre-enforcement challenge is squarely foreclosed by *Bankshot Billiards v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011); *see also Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1241 (11th Cir. 2015) (applying *Bankshot Billiards*). Pre-enforcement challenges to statutes are "disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 191 (5th Cir. 2018). In certain cases, however, "pre-enforcement review provides law-abiding citizens with a middle road between facing prosecution and refraining from otherwise constitutional conduct." *Bankshot Billiards*, 634 F.3d at 1350.

Courts thus expand standing based on a unique constitutional injury: being "chilled from engaging in *constitutionally protected* activity." *Id.* (emphasis added). But it does not apply, as this Court explained, when a person's "activity is not constitutionally protected." *Id.* Here, Plaintiffs do not allege to engage in any "constitutionally protected conduct" (of course they cannot, as federal law criminalizes the same conduct, 8 U.S.C. § 1324(a)(1)(A)(ii)), so they may not avail themselves of pre-enforcement review.

But even if Plaintiffs could use the pre-enforcement review framework, they have failed to meet the requisites.

### 1.    The unnamed, individual Plaintiffs lack an imminent injury.

The district court erred in finding standing for the individual Plaintiffs. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek[.]"). A plaintiff lacks a "certainly impending" injury required for standing if he fails to provide "concrete plans" to "imminent[ly]" violate a statute, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 & n.2 (1992), which, in a pre-enforcement challenge, requires that plaintiffs show both that their conduct is "proscribed by a statute" and that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiffs cannot meet either requirement because the individuals that Plaintiffs concretely plan to transport have been "inspected," both under the plain meaning of Florida's law and the Attorney General's interpretation of it. They face no injury.

24

**Arguably Proscribed.** For one, the plain meaning of Florida's law does not "arguably prohibit[]" Plaintiffs' conduct. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 303 (1979). An individual is "inspected" when federal officials are aware of his lack of clear admissibility. *Supra* 19. The only "evidence" of "specific facts" that Plaintiffs allege relate to their desires to transport inspected individuals, conduct not even arguably proscribed by Florida's law. *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1285 (11th Cir. 2019); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018). Take Andrea Mendoza Hinojosa, who claims a desire to "transport individuals to appointments with" federal immigration authorities. DE30-4 at 2–3. Likewise, Reinaldo Morales discusses how he in the past has driven passengers into Florida for meetings with the federal government or as part of visa applications. DE30-6 at 4. With Carmenza Aragon, she wishes to transport her grandson with a pending petition for a change in immigration status across state lines. DE30-7 at 2–3. So too for Maria Medrano Rios, who wants to transport her daughter, who has a pending application with federal authorities for DACA benefits. DE30-8 at 2. Finally, Adrian Carrillo says that he wants to transport two family members, who both have pending immigration cases. DE30-10 at 2. This transportation does not fall under the statute's scope, so that law does not prohibit Plaintiffs' conduct.[11]

---

[11] To the extent there is any ambiguity as to whether these facts about appointments demonstrate that their passengers are inspected (thus making Plaintiffs' conduct subject to the statute), that reflects only Plaintiffs failure to carry their burden to "clear

That conduct is not arguably proscribed by Florida's law for another reason. The Attorney General has disclaimed any broader interpretation of the statutory term "inspected." *See* DE50 at 2–3. The opinions of state officials who enforce state law are relevant to the arguable reading of that law. *See N.J. Bankers Assoc. v. Att'y Gen. N.J.*, 49 F.4th 849, 856 (3d Cir. 2022) (considering state Attorney General's views to determine what conduct was arguably proscribed under state law); *Planned Parenthood Greater Nw. v. Labrador*, 122 F.4th 825, 838 (9th Cir. 2024) (same); *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (same); *Cruz*, 849 F.3d at 601 (same). In *Driehaus*, for instance, the Supreme Court found that conduct was "arguably proscribed" when a state enforcer "already found probable cause to believe that [the same plaintiff] violated the statute when" it engaged in similar conduct. 573 U.S. at 162. And even if the Attorney General's opinion is not formally binding on Florida courts, it still carries great persuasive value. *See Dream Defenders v. Gov. of the State of Fla. (Dream Defenders II)*, 119 F.4th 872, 876 (11th Cir. 2024) (opinion after certified question of state law, in which the Florida Supreme Court adopted the Attorney General's reading of Florida law); *Yanes-Blanco*, 401 So. 3d at 598 (adopting Attorney General's reading of state law to incorporate principles of federal law).

---

showing that [they are] likely to establish" injury. *Murthy*, 603 U.S. at 58. In short, Plaintiffs impermissibly asked the district court to "*imagine* an injury . . . or piece together an injury sufficient" for standing on their behalf. *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019).

The district court dismissed this disavowal as irrelevant, relying on *West Virginia ex rel. Morrisey v. United States Department of Treasury*, 59 F.4th 1124, 1137 (11th Cir. 2023). DE99 at 11. This Court in *Morrisey* determined that several States had standing to enjoin the Secretary of the Treasury from enforcing a pandemic-era federal law that provided money to States. *Morrisey*, 59 F.4th at 1138. To avoid funding state tax cuts, Congress prohibited States from using those funds to "directly or indirectly offset" a decrease in "net tax revenue," but the States argued that the offset provision was unascertainable in violation of the Spending Clause. *Id.* at 1132. To the States and this Court, the "indirect" offset provision could arguably "proscribe[] a state from accepting [federal] money if it enacts any tax cut[s]" at all, given that "[m]oney is fungible." *Id.* at 1138.

*Morrisey* is not on point for two reasons. Most importantly, *Morrisey* did not involve a meaningful disclaimer. The Secretary's explanation was unclear and provided no real guidance. She simply asserted that the law was "clear" and that the States "may cut taxes so long as they 'pay' for a tax cut without using" the federal funds at issue. *Id.* Her disclaimer amounted to little more than a statement to "follow the law as written," yet parroting the law is not guidance. *Cf. Downtown Soup Kitchen v. Mun. of Anchorage*, 576 F. Supp. 3d 636, 660 (D. Alaska 2021) (disavowals are "[p]articularly" relevant when they "interpret[] the challenged law as inapplicable to the plaintiff's conduct"). Indeed, the whole problem in *Morrisey* was that States could not "ascertain" what it meant to "pay for [a] tax cut[]," 59 F.4th at 1139–44, and the Secretary did not tell them. So "[t]he only way for the States to achieve unequivocal compliance" given the Secretary's useless

27

disclaimer was to "to refrain from cutting taxes" at all. *Id.* at 1138. That would be as if the Attorney General told Plaintiffs to "just make sure your passengers are inspected," without saying what "inspected" means. But that of course is not what happened here given his substantive interpretation of "inspect." *See supra* 19; DE50 at 3–4.

*Morrisey* must also be read in light of its unique context. States "are not normal litigants for" standing and "may suffer injuries to their sovereignty that private parties do not," *Morrisey*, 59 F.4th at 1136. The injury in *Morrisey* was unique too. This Court likened the "injury to state sovereignty" to First Amendment chill, a harm that bestows more capacious standing. *Id.* at 1136 (citing *Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1288 (11th Cir. 2022)). Also akin are injuries in vagueness claims, where a law need only be "at least arguably vague as applied to" the plaintiff. *Club Madonna v. City of Miami Beach*, 924 F.3d 1370, 1382 (11th Cir. 2019). Neither the plaintiffs nor the injuries in question here justify a departure from the usual rules of standing.

**Credible Threat of Prosecution.** The individual Plaintiffs also do not face a credible threat of prosecution. Any threat of prosecution at this stage is speculative. In *Driehaus*, by contrast, the organization "was the subject of a [recent] complaint" under the relevant law. 573 U.S. at 164; *cf. Clapper*, 568 U.S. at 411 (plaintiffs' theory of standing was "substantially undermine[d]" by their "fail[ure] to offer any evidence that their communications ha[d] been monitored" under the challenged statute). And in *Holder v. Humanitarian Law Project*, the government had already "charged about 150 persons" with

violating the law and declined to disavow prosecution, should the plaintiffs "do what they say they wish to do." 561 U.S. 1, 16 (2010). Plaintiffs point to nothing similar.

What is more, the State Defendants' disclaimer of enforcement undercuts any credible threat of prosecution. State Defendants have "taken the position" that the challenged provision "ha[s] no application" beyond its interpretation of inspected. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428–29 (11th Cir. 1998); *cf. also City of South Miami v. Governor of Fla.*, 65 F.4th 631, 640 (11th Cir. 2023) (no credible threat of enforcement where record was absent of any account of state officials enforcing a law in way alleged to cause injury). In evaluating whether there was a credible threat of prosecution, the Supreme Court in *Driehaus* considered actions by state enforcers showing that those officials interpreted the law to cover the plaintiff's actions, just as it did for the arguably proscribed prong. 573 U.S. at 164–67. Federal courts have consistently found such disavowals to be probative of whether fears of enforcement are credible. *See, e.g.*, *Winsness v. Yocom*, 433 F.3d 727, 734 (10th Cir. 2006) (finding no credible threat of enforcement based on prosecutorial disavowals); *Holder*, 561 U.S. at 16 (finding refusal to disavow enforcement for plaintiff's conduct probative of a credible threat of prosecution); *Labrador*, 122 F.4th at 838 (holding that credible-threat prong "often rises or falls with the enforcing authority's willingness to disavow enforcement."); *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004) (similar); *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1468 (3d Cir. 1994) (similar). That is "[p]articularly" true "when, as here,

29

the enforcing authority's disavowal is based on interpreting the challenged law as inapplicable to the plaintiff's conduct." *Downtown Soup Kitchen*, 576 F. Supp. 3d at 660.

The district court never addressed this separate requisite for standing—thus reading it out of the law. *See Driehaus*, 573 U.S. 159, 161–62 (requiring both a "credible threat of prosecution" and a showing that plaintiff's conduct is "arguably proscribed by the law"). Nor does *Morrisey* absolve courts of considering this separate requirement for the same reasons mentioned above. *See supra* 27–28. At any rate, *Wilson* controls as prior-panel precedent, holding that a disclaimer vitiates a credible threat of enforcement where it meaningfully explains how a provision does not cover a plaintiff's conduct. *Wilson*, 132 F.3d at 1428–29; *see also Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018) (prior-panel precedent controls until "overruled by the Court sitting en banc or by the Supreme Court").

### 2.    The Farmworker Association also lacks an injury.

An organization may show standing through organizational standing (injury to itself) or associational standing (injury to its members). *See City of South Miami v. Governor of Fla.*, 65 F.4th 631, 637 (11th Cir. 2023). The district court concluded that the Farmworker Association had sufficiently alleged organizational standing through its diversion of resources, and thus did not reach whether it had associational standing. DE99 at 15–17, 32–34. Neither theory works.

30

### a.    The district court erred in allowing the Farmworker Association to spend its way into organizational standing.

For its organizational standing, the Farmworker Association attempted to rely on (1) lost revenue through lost membership and (2) a diversion of resources away from its core mission. Both methods fail.

As to lost membership, the Association claims standing from its loss of dues. It asserts that "[a]pproximately 600 families that include dues-paying" members left Florida in May 2023, and that "approximately 100 member families will not return if SB 1718 remains in effect[] because they do not want to risk a felony charge." DE30-3 at 12. These assertions are speculative. The Farmworker Association points to no evidence that any member left or will not return because of SB 1718. *See Clapper*, 568 U.S. at 411 (discussing a similar lack of evidence); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1245–46 (N.D. Fla. 2022) (collecting cases that require "evidence [of] specific facts" to support standing in the preliminary-injunction context).

Equally important, the Association fails to distinguish between changes to the human-smuggling provision—Section 787.07—and other changes to Florida law implemented by SB 1718. Some of these changes, unlike Section 787.07, expressly regulate illegal aliens and are thus far more likely to cause illegal aliens to leave Florida. These changes include, for example, E-Verify requirements making it more difficult for illegal aliens to obtain work, driver's license restrictions applicable to illegal aliens, and requirements for hospitals to collect immigration status information. *See generally* Fla. Laws ch.

31

2023-40 (May 10, 2023). The Association's failure to disaggregate the effects of unchallenged provisions of SB 1718 is fatal. *See Maverick Media Grp., Inc. v. Hillsborough Cnty.*, 528 F.3d 817, 820 (11th Cir. 2008) (explaining that a plaintiff cannot establish redressability if the injury would continue because of some action not challenged in court); *KH Outdoor, LLC v. Clay Cnty.*, 482 F.3d 1299, 1303–04 (11th Cir. 2007) (similar).

As for its diversion-of-resources theory, the Farmworker Association claims an injury in frustration "from its core mission of strengthening farmworker communities." DE30-3 at 11. It does not claim to be subject to the law. Rather, the Association claims that Florida's law forces it to divert "resources from its core mission of strengthening farmworker communities." *Id.*

The Farmworker Association's self-inflicted wounds, however, are precisely the kind of injuries that cannot support standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("[A]n organization . . . cannot spend its way into standing[.]"). "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *Id.* In *Hippocratic Medicine*, the plaintiff medical associations contended, similarly to the Association here, that they had "incurr[ed] costs to oppose" the FDA's actions in deregulating the abortion drug mifepristone. *Id.* They claimed that the FDA's actions had "caused" them "to spend 'considerable resources' to the detriment of other spending priorities." *Id.* That was not enough. "[A]n organization that has not suffered

32

a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* That is true even if "an organization diverts its resources in response to a defendant's actions," *id.* at 395, including when it takes steps "to inform their members and the public" of those actions, *id.* at 394. It is thus no longer sufficient for an organizational plaintiff to locate an "injury to [an] identifiable community that [it] seeks to protect" and spend money to address that concern. *City of S. Miami*, 65 F.4th at 638.

That is precisely what the Association claims here—spending money to "provid[e] Know Your Rights presentations to specifically prepare for and educate our members on the impacts of SB 1718," to "train[] existing volunteers and new volunteers on [the human-smuggling provision] and its impact," and to answer "calls with questions and concerns regarding travel to Florida and/or travel back into Florida." DE30-3 at 9–10. Those effects impair its mission, in the Association's view, because they take away money it would have spent on, among other things, "encouraging farmworkers' civic participation, advancing and educating the community on agroecology, building farmworker coalitions, [and] supporting worker's rights." *Id.* In other words, rather than spend money to serve its members in the ways it did before, it now spends money to oppose Florida's human-smuggling provision.

33

### b.    The Farmworker Association failed to establish associational standing.

Nor can the Farmworker Association rely on associational standing, as they have not shown that any of their members "would otherwise have standing to sue in their own right." *Jacobson*, 974 F.3d at 1249.

The Farmworker Association's vague allegations fail to establish that an injury is "imminent." *See* DE30-3 at 8–9. The Association offers no "description of concrete plans" or "specification" of when its members will drive uninspected persons into the State. *See Lujan*, 504 U.S. at 564 (explaining that mere "intentions" do not suffice). It must "make specific allegations" based on "specific facts . . . that one or more of [its] members would be directly affected" by showing that those members have an imminent threat of prosecution. *Summers*, 555 U.S. at 498; *see also City of Miami Gardens*, 931 F.3d at 1285. The Association has not done so. Instead, the Farmworker Association describes "past" conduct, *Lujan*, 504 U.S. at 564, and then asserts that each member "fears" that similar conduct in the future will "expose" the member to felony charges. DE30-3 at 8–9. As is true for the individual Plaintiffs, vague fears of harm, without any concrete plans that would trigger enforcement, are not enough. *See Summers*, 555 U.S. at 496 (holding that a "vague desire to return [to a national forest] is insufficient to satisfy the requirement of imminent injury").

What is more, the Farmworker Association's general allegations involve, in many instances, conduct that does not violate the statute. *See Wilson*, 132 F.3d at 1428–29

34

(explaining that a plaintiff lacks injury when his conduct does not violate the challenged statute). The Association, for example, relies on the transportation of passengers who have obtained lawful status or have pending removal proceedings. DE30-3 at 8–9. But such individuals have been "inspected" under Florida's human-smuggling law, and those who transport them will not face prosecution.

**B.     Plaintiffs lack a cause of action to enforce federal immigration law.**

1. Plaintiffs also lack a "cause of action" to enforce the INA. *Davis v. Passman*, 442 U.S. 228, 239 (1979). They rely solely on an equitable cause of action, DE1 at 30 (invoking only the Supremacy Clause for their preemption claim), which fails because the "fairest reading" of the INA shows that "Congress [has] displace[d]" "equitable relief." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328–29 (2015). Plaintiffs "cannot, by invoking [courts'] equitable powers, circumvent" that statutory limit. *Id.* at 328.

The INA's text bears that out. In that statute, Congress established an intricate enforcement scheme for particular federal officers. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) (where Congress created a "detailed remedial scheme," federal courts "should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*"). The statute charges the Secretary of Homeland Security "with the administration and enforcement" of the INA unless another part "relate[s] to the powers, functions, and duties conferred upon" other Executive Branch officers. 8 U.S.C. § 1103(a)(1). Some examples of carveouts are the federal

35

bars on transportation and harboring of illegally present aliens (from which Plaintiffs draw their preemption claim), providing for enforcement by specified federal officers—namely a U.S. Attorney. 8 U.S.C. § 1329 (vesting enforcement in the U.S. Attorney for suits under "this subchapter"); *see* 8 U.S.C. §§ 1324, 1326, 1330(a) (providing that "fine[s], penalt[ies] or expenses imposed or incurred" under several sections of Subchapter II may be "recovered by civil suit, in the name of the United States"). Because federal law "expressly confers enforcement authority on" specific federal officers, it "preclud[es] enforcement by" private plaintiffs. *Corey v. Rockdale Cnty.*, 689 F. Supp. 3d 1251, 1263 (N.D. Ga. 2023), *vacated as moot,* No. 23-13097, 2025 WL 1325325 (11th Cir. May 7, 2025).[12]

That statutory limitation is even clearer given the background principles of criminal and immigration law, where private rights and interests are at their nadir. *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 261 & n.8 (2011) (providing that *Ex parte Young* claims "cannot occur unless the" plaintiff "has been given a federal right of" his or her "own to vindicate" under the statute). After all, prosecution is a "core executive power." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 209 (2020); *see also*

---

[12] Congress also provided for limited private enforcement of certain criminal provisions of the INA through the Racketeering Influence and Corrupt Organizations (RICO) Act. Under RICO, a private party may sue to recover damages for transportation and harboring offenses in the INA. 18 U.S.C. §§ 1961(1)(F), 1962, 1964(c). "Congress's decision to create a limited private cause of action" only "indicates more clearly" that "that Congress chose to eliminate general equitable relief for private parties." *Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman*, 272 F. Supp. 3d 554, 566 (S.D.N.Y. 2017).

*Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 902–05 (10th Cir. 2017) (rejecting preemption challenge to Colorado's marijuana laws under the Controlled Substances Act because the plaintiffs lacked cause of action).[13]

More fundamentally, "[n]o case during the last generation creates a private right of action to enforce a statute cast in the form of a criminal prohibition[.]" *Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 200–01 (7th Cir. 1994). Immigration law only reinforces that private enforcement is inappropriate. Plaintiffs' base their whole theory of preemption on the federal government's "exclusive powers over the regulation of immigration," DE1 at 5, and the need for INA enforcement decisions to be "made with one voice," DE30-1 at 11 (quoting *Arizona*, 567 U.S. at 409–10). Though they are wrong that States are entirely excluded from regulating in or near this realm, the "one voice" they propose to elevate would in any event not be theirs to control. *See Arizona*, 567 U.S. at 409–10. Congress exercised its "broad discretion" and "power over the manner of the[] implementation" of the INA by "leav[ing] the enforcement of federal law to federal actors." *Armstrong*, 575 U.S. at 325–26.

The district court wrongly thought otherwise. It held that Congress displaced Plaintiffs only from prosecuting a person for crimes, not from enforcing implied

---

[13] In *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, this Court understood the Supremacy Clause to supply a cause of action to enforce the INA, *see* 691 F.3d 1250, 1261 (11th Cir. 2012), but that analysis has been abrogated by *Armstrong*, 575 U.S. at 324–25 ("It is equally apparent that the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action.").

preemption created by those same provisions. DE137 at 9. To the court, Plaintiffs "are not seeking to enforce [the INA's] criminal prohibitions," but "seek to enjoin enforcement of a state law preempted by" the INA. *Id.* Yet implied preemption stems from Congress's "clear and manifest purpose" in a statute to establish a rule that displaces state law, and enforcing that purpose *is* enforcing part of the statute's rules that Congress created. *Arizona*, 567 U.S. at 400.

The district court independently rejected this argument by applying *Armstrong* too rigidly. *Armstrong* asks whether the "fairest reading" of a statute shows that "Congress [has] displace[d]" private enforcement. *Armstrong*, 575 U.S. at 329. The "fairest reading" of the Medicaid Act did so based on two textual indications: Congress provided for federal officers' "enforcement by withholding funds" and the "judicially unadministrable nature of [the statutory] text." *Id.* Rather than focus on the "fairest reading," the district court saw those textual clues as necessary and found that the INA had neither. DE137 at 9–12. That second conclusion is dubious, given that Congress "[e]xplicitly confer[red] enforcement of [a] judgment-laden standard" solely on federal officers. *Armstrong*, 575 U.S. at 328; *see United States v. Texas*, 599 U.S. 670, 679 (2023) (discussing the federal government's "absolute discretion" in criminal law enforcement). But the first conclusion is also warped, as "[t]here is no indication in *Armstrong* that both factors must be satisfied." *Zibelman*, 272 F. Supp. 3d at 566. Like in any statutory interpretation case, the touchstone of *Armstrong* was a holistic endeavor, applying canons of construction and focusing on the "fairest reading" of the text in "context." 575 U.S. at 328–29.

The Court rejected a checkbox-style analysis, *see id.* (stating that the first textual factor "might not, *by itself*" be dispositive), and eschewed a clear statement rule, *id.* at 329. The district court's decision, however, reverts back to this same analysis the Supreme Court rejected. *Id.*

Nor does the INA grant Plaintiffs privately enforceable, "personal rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). When suing in equity, the plaintiff must come armed with a federal law endowing it with privately enforceable rights, *see Safe Sts. All.*, 859 F.3d at 902–04, bestowed "in clear and unambiguous terms," *Gonzaga*, 536 U.S. at 290. The only right Plaintiffs identify is the right not to be regulated because of preemption, but that is insufficient. For a statute to grant rights, "its text must be phrased in terms of the persons benefited." *Id.* at 284. If anything, the INA restricts Plaintiffs' rights by criminalizing their conduct.

2. The Farmworker Association as an organizational plaintiff is even more poorly suited to wield an equitable cause of action. Whether the Farmworker Association may sue in equity depends on whether granting it relief aligns with the relief "traditionally accorded by courts of equity" at the Founding. *Grupo Mexicano de Desarrollo S.A., v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

It does not. As Judge Oldham recently observed, the *Ex parte Young* action is available only to private plaintiffs "to preemptively assert 'in equity . . . a defense that would otherwise have been available in the State's enforcement proceedings at law.'" *United States v. Texas*, 97 F.4th 268, 310 (5th Cir. 2024) (Oldham, J. dissenting); *see also*

39

*Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (*Ex parte Young*

exists "to raise in equity a defense available at law"). Even if the INA did not displace

private enforcement, *Ex parte Young* at most protects an individual who claims that

"federal law *immunizes him* from state regulation." *Armstrong*, 575 U.S. at 326 (emphasis

added); *cf. also June Med. Servs. v. Russo*, 591 U.S. 299, 316 (2020) (noting that "a party

cannot ordinarily rest his claim to relief on the legal rights or interests of third parties").

In other words, it protects only those who are "direct targets of regulation." Caleb Nel-

son, *"Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 715 (2019).

The Farmworker Association is no such plaintiff.[14] At most, only its members might

be.

### C.   Federal immigration law does not preempt the human-smuggling law.

The district court held that Florida's human-smuggling law was field and conflict

preempted. DE99 at 29. Neither holding is correct. That supplies an additional basis

for reversing the preliminary injunction.

### 1.   Florida's human-smuggling law is not field preempted.

Field preemption is—and should be—a "rare case[.]" *Kansas v. Garcia*, 589 U.S.

191, 208 (2020). Field preemption analysis proceeds in two steps. At step one, Plaintiffs

---

[14] That is not to say that plaintiffs could never these preemption claims: individuals may do so as a legal defense in a state enforcement proceeding as *Ex parte Young* outlined.

must first identify a field fully occupied by federal law. *Id.* Then they must show that Florida's law "falls within the pre-empted field as defined by [the relevant] precedent[]." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). They have failed at both steps.

a. Plaintiffs have failed to show that federal law preempts the field of transportation of uninspected persons. To establish that a field is preempted, Plaintiffs must show that the "clear and manifest purpose of Congress" was a "complete ouster of state power" in that area. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). That can arise from a "framework of regulation so pervasive" that Congress necessarily "left no room for the States to supplement it," or from a federal interest "so dominant" that the federal system logically "precludes enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (cleaned up). Because field preemption is strong medicine, "the relevant field should be defined narrowly." *City of El Cenizo*, 890 F.3d at 177; *see also Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 718 (1985) (taking narrow view of a field). And even for laws touching on immigrants, "courts should assume that" Congress has "not superseded" the "historic police powers of the States." *Arizona*, 567 U.S. at 400.

The Supreme Court illustrated these preemption principles in *Kansas v. Garcia*. There, Kansas prosecuted aliens under a state identity-theft statute for their use of fraudulent information on employment forms. 589 U.S. at 198. Invoking federal preemption, the defendants challenged their convictions because federal immigration

41

law bars the use of "any information contained in" a federal Form I-9 "for purposes other than for enforcement of" federal law. *Id.* at 196–97.

The Supreme Court upheld the convictions. By its measure, Kansas's law was not impliedly preempted even though the same information that served as the basis for the prosecutions appeared on the aliens' I-9 forms. *Id.* at 210–11. Federal law simply did not occupy the "field of employment verification," *id.*, because nothing "in the text and structure of the [immigration] statute" indicated a congressional intent to oust States from the field, *id.* at 208. Crucially, the Supreme Court adopted a narrow reading of *Arizona*'s field-preemption holding to extend only to "the field of *alien registration.*" *Id.* at 210 (emphasis added). Alien registration exemplifies the "rare case[]" for field preemption, *id.* at 208, because federal law "ma[de] a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders," *id.* at 210. Punctuating that holding, *Garcia* clarified that mere "overlap" in state and federal criminal statutes "does not even begin to make a case for conflict preemption." *Id.* at 211.

Those principles show that federal law does not preempt the field of transporting uninspected persons. Florida's law regulates all persons, citizen and alien alike, and only applies to uninspected persons, those of which the federal government is unaware. Those distinctions make the most relevant provision of federal law not Title 8, which governs immigration, but provisions of Title 19, which governs customs. *See, e.g.*, 19 U.S.C. § 1459 (requiring all persons arriving in the United States to submit to

inspection). And Plaintiffs present no argument that Congress has exclusively occupied the field of transporting uninspected individuals across state lines. Any "overlap" in criminal prohibitions does not justify preemption, *Garcia*, 589 U.S. at 211, nor does "the text and structure of the statute[s]" indicate any preemptive intent, *id.* at 208. Because Congress has not "unmistakably . . . ordained [the] exclusivity of federal regulation" in that area, Congress has not occupied that field. *DeCanas*, 424 U.S. at 361.

b. Plaintiffs have failed to show that Florida's law falls into a different preempted field. At this second step of field preemption, plaintiffs must show that the state law is "aimed directly at" the federal field "as defined by [] precedent[]," *Oneok*, 575 U.S. at 385, which occurs where a state law "directly, substantially, and specifically regulates" in the field, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992). And because preemption guards the "purposes and objectives of Congress," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 & n.5 (1990), courts consider Congress's "purposes of pre-emption" in assessing the state law's aim. *Oneok*, 575 U.S. at 385.

In finding Florida's law preempted, the district court felt bound by *Georgia Latino*, even while doubting that case's correctness. DE99 at 39. That opinion, the district court believed, compelled it to hold that Florida's law fell in the field of "prohibitions on the transportation, harboring, and inducement of unlawfully present aliens," which this Court held the INA preempted. DE99 at 22–24 (quoting *Ga. Latino*, 691 F.3d at 1266). But Florida's law is not "unmistakably and unambiguously directed" at that field, *Oneok*,

43

575 U.S. at 386, "as defined by" *Georgia Latino, id.* at 385. The law here is distinct from the state statute in *Georgia Latino* in two critical respects.

First, Florida's law does not regulate *aliens*, it regulates persons regardless of immigration status. *See Oneok*, 575 U.S. at 374 (upholding a state's regulation of "all businesses in the marketplace," including natural gas companies, even though Congress occupied the field of natural gas regulation); *see also Garcia*, 589 U.S. at 210–11 (upholding state identity theft statute that applied to all persons). Citizens and aliens can be unlawfully transported,[15] and citizens and aliens alike can violate the human-smuggling statute by transporting them. The law in *Georgia Latino*, by contrast, criminalized "transporting or moving an illegal *alien*." 691 F.3d at 1256 (emphasis added).

Second, Florida's law does not turn on a person's lawful or unlawful presence, it turns on the federal government's awareness of that person's presence in the country. Central to *Georgia Latino* was the panel's (mistaken) belief that Congress's purpose in the INA was to provide the Executive Branch with exclusive "enforcement" "discretion" over the INA's criminal provisions relating to aliens through the Executive Branch's "enforcement priorities." 691 F.3d at 1265–66. But discretion implies awareness. *Cf. United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965)) (the "exercise" of

---

[15] *See* Hum. Smuggling & Trafficking Ctr., *Domestic Human Trafficking – An Internal Issue* – at 2 (2008), https://tinyurl.com/2wzw7yry ("[I]t is estimated that about 293,000 American youth are currently at risk of becoming victims of commercial sexual exploitation[.]"); *cf. also Frontline Against Fentanyl*, U.S. Customs & Border Prot. (Aug. 06, 2025), https://tinyurl.com/yyh5mn35 (noting that most fentanyl is smuggled by U.S. citizens).

"discretion" entails "whether or not there shall be a prosecution in a particular case"); *United States v. Gaubert*, 499 U.S. 315, 325 (1991) (discretion "involves choice or judgment"). Where the federal government is not aware of a crime, it cannot exercise its enforcement "discretion," nor have "enforcement priorities." Florida's law therefore cannot infringe on this federal interest.

The district court dismissed these distinctions as illusory. DE99 at 25–26. To the district court's "common sense," "the category of uninspected *citizens*" "covers a relatively small (and statistically insignificant) subset of people." *Id.* Yet these distinctions are crucial to the preemption analysis because it demonstrates that Florida has taken pains to respect Congress's "purposes of pre-emption" in this field. *Oneok*, 575 U.S. at 385. As this Court saw it in *Georgia Latino*, Congress drew that field to protect federal enforcement discretion over immigration crimes. Florida's statute purposely steers clear of any infringement on the federal government's domain, so the human-smuggling provision cannot be "unmistakably and unambiguously directed" at the enforcement discretion of the Executive Branch over the transportation of illegal aliens. *Id.* at 386.

Given these meaningful differences, the district court ultimately extended—not applied—*Georgia Latino*. There is "a difference between following a precedent and extending a precedent." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). *Garcia* "undermined"—indeed rejected—the "reasoning" of that "moribund" decision, so the district court erred by "extend[ing] [that precedent] by even a micron." *Id.* In *Georgia Latino*, this Court relied on Congress's criminalization of the transportation of

45

unlawfully present aliens and was also concerned that state enforcement of overlapping crimes would "threaten the uniform application of the INA" and potentially implicate foreign-policy interests unmoored from the INA's text and structure. 691 F.3d at 1266.

As the district court seemed to understand, *Georgia Latino* flouts foundational preemption principles. *See* DE99 at 39. In *Georgia Latino*, this Court primarily relied on the supposed "comprehensive" nature of the criminal prohibitions in INA and amorphous federal interests. 691 F.3d at 1263–66. The INA does not support that sweeping vision of preemption. This Court, in holding otherwise, relied on the fact that the INA criminalizes the "transportation . . . of unlawfully present aliens," among other activities, and summarily concluded that this regulation "illustrates an overwhelmingly dominant federal interest." *Id.* While that field does not apply to Florida's non-immigration law in any event, Congress's choice to criminalize conduct far from shows that it also chose to foreclose state laws. *See Garcia*, 589 U.S. at 212. Such a view would unwind countless overlapping state crimes, from prohibitions on manufacturing narcotics to fraud and murder. If *Georgia Latino* was right to "draw exaggerated inferences" of a dominant federal interest from mere criminalization, *Garcia* was wrong. *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("[W]ishes are not laws," and preemption is not "deployed to elevate abstract and unenacted legislative desires above state law[.]" (cleaned up)).

46

*Georgia Latino*'s analogy to alien registration—the sole field the Supreme Court has held preempted by the INA—was also inapt. 691 F.3d at 1265 (citing *Arizona*, 567 U.S. at 400–02). The INA's criminal provisions regarding transportation are far less detailed than the alien-registration provisions, which define extensively what, when, how, and with whom aliens must register. *Compare* 8 U.S.C. §§ 1324, 1325, 1326, *with* 8 U.S.C. §§ 1301–06. The INA's criminal provisions are no more detailed than any other federal crime, while the registration provisions are more detailed and uniquely limit enforcement of registration crimes to specific "person[s] authorized" under regulations issued by the "Attorney General." 8 U.S.C. § 1304(c). Unsurprisingly then, the Supreme Court has declined to extend *Arizona*. *See Garcia*, 589 U.S. at 210.

Regardless, preemption may not be "inferred merely from the comprehensive character" of federal law alone. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). In *Arizona*, the Court relied on both comprehensiveness and the unique federal interests involved in the field of illegal-alien transportation. *See* 567 U.S. at 400–03. While the human-smuggling law does not implicate that field, this Court in *Georgia Latino* never identified any similarly unique federal interests of illegal-alien transportation, nor do the ones in *Arizona* translate to that field. There, registration of "perfectly law-abiding" aliens created expectations for other nations about the "protection of the just rights of a country's own nationals when those nationals are in another country." *Hines v. Davidowitz*, 312 U.S. 52, 64–66 (1941). Those expectations stemmed from "obligations" under treaties and the longstanding "customs defining with more or less certainty

47

the duties owing by all nations to alien residents." *Id.* at 65. But the illegal-alien crimes, in contrast, affect only *non-law-abiding* aliens, *see id.* at 64–66, a class of individuals that States have long regulated, *see Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part, dissenting in part). Other nations also do not have as strong an interest in protecting those non-law-abiding aliens, *see Hines*, 312 U.S. at 64–66, making it far less likely that Congress's "clear and manifest purpose" was to preempt a law like Florida's. *DeCanas*, 424 U.S. at 357.

### 2.     Florida's human-smuggling law is not conflict preempted.

For the same reasons, Plaintiffs have also not surmounted the "high threshold" for conflict preemption. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion). The district court held that Florida's human-smuggling law was also conflict preempted because of *Georgia Latino*. DE99 at 28–29. But *Georgia Latino* found conflict preemption from federal enforcement discretion and how parallel state law "threaten[s] the uniform application of the INA." 691 F.3d at 1266. As explained, Florida's law does not threaten that discretion in any application.

Florida's cooperation with federal enforcement efforts further undermines any claim of conflict with federal discretion. Many Florida law-enforcement agencies have signed Section 287(g) agreements with the federal government. *See* 8 U.S.C. § 1357(g). Those agreements grant those agencies "[t]he power and authority to arrest," to "maintain custody," "to interrogate," and "prepare charging documents" for aliens based on violations of federal immigration law. *E.g.*, *Memorandum of Agreement*, ICE,

48

https://tinyurl.com/5epbw6vf (agreement with Florida Highway Patrol). When Florida officials enforce both federal and state law for the same criminal activity by aliens, there can be no conflict with federal enforcement discretion. Because "[f]ederal authorities play[] a role" in state enforcement actions by "support[ing]" state officials through Section 287(g) agreements, those actions cannot "frustrate[] any federal interests." *Garcia*, 589 U.S. at 212.

In all events, the conflict preemption holding in *Georgia Latino* was undermined in *Garcia*. Prosecutorial discretion exists regarding every criminal law, so the district court's reasoning would extend to any state law that overlapped with federal law. Again, mere "overlap" in federal and state criminal law does not equal preemption. *Garcia*, 589 U.S. at 211. Countless crimes are duplicated at the state and federal levels, from murder to racketeering conspiracies to kidnapping to child pornography. *See Zyla Life Scis. v. Wells Pharma of Houston, LLC*, 134 F.4th 326, 335 (5th Cir. 2025) (noting "[t]he implications" of this view "are staggering" "[g]iven the extraordinary reach of federal law"). For that reason, "there is no conflict in terms, and no possibility of such conflict" between state and federal law when state law "makes federal law its own." *California v. Zook*, 336 U.S. 725, 735 (1949). And "the possibility that federal enforcement priorities might be upset is not enough" either. *Garcia*, 589 U.S. at 212. Preemption arises instead from "'the Laws of the United States,'" not the "enforcement priorities" or "preferences" of federal officials. *Id.* at 212.

49

## III.    THE REMAINING EQUITABLE FACTORS DO NOT SUPPORT AN INJUNCTION.

The equities favor the State. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025). Even more so when a law regulates "harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Florida's interest in ensuring individuals in its territory are inspected is legitimate. As just one example, traffickers have "successfully smuggl[ed] mass quantities of deadly illicit fentanyl past" federal agents,[16] endangering Floridians.[17] In fiscal year 2024 alone, Border Patrol seized 27,000 pounds of fentanyl—enough to kill every single American several times over.[18] Those effects cost many Floridians their lives—the flooding of fentanyl into the State killed 5,083 Floridians in 2022, the second-highest of any state

---

[16] *Subcommittee on Border Security and Enforcement Demands Answers in Phase Two of Mayorkas Investigation*, House Comm. on Homeland Sec. (July 13, 2023), https://tinyurl.com/a2udkxt8.

[17] *AG Moody and Law Enforcement Leaders Sound the Alarm as Deadly Fentanyl Catapults Panhandle Counties to Top Spot for Per Capita Opioid Death Rate in Florida*, Office of Attorney General (Aug. 2, 2023), https://tinyurl.com/ywf9utmh.

[18] Dep't of Homeland Security, *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024), https://tinyurl.com/bf65z7n2; *see also* DEA, *Facts About Fentanyl* (last visited June 9, 2025), https://tinyurl.com/mte3r9px (explaining that 2 milligrams of fentanyl can be a fatal dose for an average American).

in the Nation.[19] There can be no doubt that "enforcement of [Florida's law] will decrease illegal border crossings and associated harms like drug and human trafficking," *Texas*, 97 F.4th at 334 (Oldham, J., dissenting), yet the State is unable to utilize Florida's human-smuggling law to address this crisis.

## CONCLUSION

The Court should vacate the injunction and reverse, or at minimum, certify a question to the Florida Supreme Court.

Dated: August 15, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

/s/ *Robert S. Schenck*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
JASON MUEHLHOFF
NATHAN A. FORRESTER (FBN 1045107)
  *Chief Deputy Solicitors General*
ROBERT S. SCHENCK (FBN 1044532)
  *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*jeffrey.desousa@myfloridalegal.com*

---

[19] USA Facts, *Are fentanyl overdose deaths rising in the US?* (last updated Sept. 27, 2023), https://tinyurl.com/mvus7kff.

51

*jason.muehlhoff@myfloridalegal.com*
*nathan.forrester@myfloridalegal.com*
*robert.schenck@myfloridalegal.com*
*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,991 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Robert S. Schenck*
Assistant Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Robert S. Schenck*
Assistant Solicitor General