# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Docket No. 25-11578

THE FARMWORKER ASSOCIATION OF FLORIDA, INC., ET AL,

*Plaintiffs – Appellees,*

v.

ATTORNEY GENERAL, STATE OF FLORIDA, ET AL,

*Defendants – Appellants.*

**On Appeal from**
the United States District Court for the Southern District of Florida
No. 1:23-cv-22655-RAR

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Omar Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

Paul R. Chavez
Christina LaRocca
AMERICANS FOR IMMIGRANT
JUSTICE
2200 NW 72nd Ave
P.O. Box No 520037
Miami, FL 33152

Spencer Amdur
Hannah Steinberg
Cody Wofsy
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
hsteinberg@aclu.org
cwofsy@aclu.org
osarabia@aclu.org

T: (305) 573-1106
pchavez@aijustice.org
clarocca@aijustice.org

Emma Winger
Michelle Lapointe
AMERICAN IMMIGRATION
COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7552
ewinger@immcouncil.org
mlapointe@immcouncil.org

Amy Godshall
Daniel B. Tilley
ACLU FOUNDATION OF FLORIDA,
INC.
4343 West Flagler Street, Suite 400
Miami, FL 33134
T: (786) 363-2700
agodshall@aclufl.org
dtilley@aclufl.org

Felix A. Montanez
Preferential Option Law Offices, LLC
P.O. Box 60208
Savannah, GA 31420
(912) 604-5801
felix.montanez@preferentialoption.com

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ............................................ xii

CERTIFICATE OF INTERESTED PERSONS .................................................... xiii

CORPORATE DISCLOSURE STATEMENT ...................................................... xiii

STATEMENT OF THE ISSUES .......................................................................... 1

INTRODUCTION ............................................................................................... 2

STATEMENT OF THE CASE ............................................................................. 4

   A.  Congress's Pervasive Regulation of Noncitizens' Entry, Movement and Residence ............................................................................................ 4

   B.  Section 10 of Senate Bill 1718 ...................................................... 6

   C.  Procedural History ......................................................................... 7

STANDARD OF REVIEW .................................................................................. 10

SUMMARY OF THE ARGUMENT .................................................................... 10

ARGUMENT ...................................................................................................... 12

   I.  DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT. ............. 12

     A.  Plaintiffs Have Standing. ............................................................ 12

       i.  Plaintiffs Have Standing Even Under Defendants' Narrow Construction of the Statute. ............................................................................. 13

       ii.  Defendants' Narrow Construction Cannot Defeat Standing for the Remaining Plaintiffs. ................................................................. 15

iii. Preemption Claims Are Not Categorically Barred as Defendants Claim.

.................................................................................................................24

    B.   Plaintiffs May Sue in Equity. ...................................................................26

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...........32

    A.   Section 10 Is Field Preempted....................................................................33

    B.   Section 10 Is Conflict Preempted................................................................43

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN

WEIGHING THE EQUITIES. ..............................................................................49

CONCLUSION ....................................................................................................51

CERTIFICATE OF COMPLIANCE ....................................................................53

CERTIFICATE OF SERVICE ............................................................................54

## TABLE OF AUTHORITIES

**Cases**

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*,
  569 U.S. 641 (2013)..................................................................................39

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013)......................................................................................25

*Arizona v. United States*,
  567 U.S. 387 (2012)............................................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)............................................................................*passim*

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)............................................................................16, 23

*Bankshot Billiards v. City of Ocala*,
  634 F.3d 1340 (11th Cir. 2011) ...............................................................26

*Bond v. United States*,
  564 U.S. 211 (2011)............................................................................25, 29

*Collins v. Yellen*,
  594 U.S. 220 (2021)..................................................................................25

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
  76 F.4th 425 (5th Cir. 2023) .....................................................................28

*Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*,
  127 F.4th 1294 (11th Cir. 2025) .........................................................*passim*

*Dream Defenders v. Gov. of the State of Fla.*,
  57 F.4th 879 (11th Cir. 2023) ...................................................................16

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ....................................................................22

*Edger v. McCabe*,
  84 F.4th 1230 (11th Cir. 2023) .................................................................16

*Ex parte Young*,
209 U.S. 123 (1908)................................................................*passim*

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..............................................................21, 22

*Fla. Immigrant Coal. v. Att'y Gen.*,
No. 25-11469, 2025 WL 1625385 (11th Cir. 2025)..........................13, 26, 30, 50

*Fla. Immigrant Coal. v. Uthmeier*,
780 F. Supp. 3d 1235 (S.D. Fla. 2025)..........................................33

*Florida Immigrant Coalition v. Uthmeier*,
No. 25-11469 (11th Cir.) ..........................................................3

*Fuentes-Espinosa v. People*,
408 P.3d 445 (Colo. 2017)..........................................................2

*In re G*,
3 I & N Dec. 136 (BIA 1948) ...................................................17

*Ga. Latino Alliance for Hum. Rts. v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012) ...........................................*passim*

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)..................................................................36

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)..................................................................27

*Gonzalez v. Governor of Ga.*,
978 F.3d 1266 (11th Cir. 2020) ...............................................10

*Hisp. Int. Coal. of Ala. v. Gov. of Ala.*,
691 F.3d 1236 (11th Cir. 2012) ...............................................26

*Houston v. Marod Supermkts., Inc.*,
733 F.3d 1323 (11th Cir. 2013) ...............................................14

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................20

iv

*Idaho Org. of Res. Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) ...............................................26

*Jefferson Cnty. v. Acker*,
210 F.3d 1317 (11th Cir. 2000) ........................................................41

*Kansas v. Garcia*,
589 U.S. 191 (2020)..............................................................41, 42, 47, 48

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................................25

*Kondrat'yev v. City of Pensacola*,
949 F.3d 1319 (11th Cir. 2020) ........................................................42

*Lozano v. City of Hazleton*,
724 F.3d 297 (3d Cir. 2013) .............................................................32

*Mathis v. U.S. Parole Comm'n*,
749 F. Supp. 3d 8 (D.D.C. 2024).....................................................28

*Medina v. Planned Parenthood S. Atl.*,
145 S. Ct. 2219 (2025).....................................................................27

*Murphy v. NCAA*,
584 U.S. 453 (2018)....................................................................24, 29

*Nat'l Ass'n of the Deaf v. Florida*,
980 F.3d 763 (11th Cir. 2020) .........................................................32

*Newton v. Duke Energy Fla.*,
895 F.3d 1270 (11th Cir. 2018) ............................................11, 26, 27

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015).........................................................................38

*Padres Unidos de Tulsa v. Drummond*,
785 F. Supp. 3d 993 (W.D. Okla. 2025)...........................26, 28, 34, 41

*Picard v. Magliano*,
42 F.4th 89 (2d Cir. 2022) ...............................................................15

v

*Plyler v. Doe*,
457 U.S. 202 (1982)..................................................................................34

*Pub. Util. Comm'n v. United Fuel Gas Co.*,
317 U.S. 456 (1943)..................................................................................50

*In re Quilantan*,
25 I & N Dec. 285 (BIA 2010) ..................................................................17

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)..................................................................................33

*Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*,
547 U.S. 47 (2006)....................................................................................13

*Safe Streets Alliance v. Hickenlooper*,
859 F.3d 865 (10th Cir. 2017) ..................................................................28

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988)..............................................................................36, 39

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ................................................................49

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996)....................................................................................31

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983)................................................................................25, 31

*Shen v. Simpson*,
687 F.Supp.3d 1219 (N.D. Fla. 2023) ......................................................15

*State v. Fam. Bank of Hallandale*,
623 So. 2d 474 (Fla. 1993) .......................................................................23

*Stenberg v. Carhart*,
530 U.S. 914 (2000)..................................................................................23

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)..............................................................................*passim*

*Tsuji v. Fleet*,
366 So. 3d 1020 (Fla. 2023) .................................................................18

*Turtle Island Foods, S.P.C. v. Strain*,
65 F.4th 211 (5th Cir. 2023) ................................................................15

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ...................................................*passim*

*United States v. Iowa*,
126 F.4th 1334 (8th Cir. 2025) .....................................34, 41, 45, 48

*United States v. Locke*,
529 U.S. 89 (2000)..............................................................................32

*United States v. Moreno*,
561 F.2d 1321 (9th Cir. 1977) .....................................................35, 47

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) .........................................................2, 34

*United States v. Stonefish*,
402 F.3d 691 (6th Cir. 2005) ........................................................35, 46

*United States v. Texas*,
--- F. Supp. 3d ---, 2025 WL 2170007 (W.D. Tex. July 31, 2025) ..........2, 20, 21

*United States v. Texas*,
719 F. Supp. 3d 640 (W.D. Tex. 2024) ...............................................50

*United States v. Texas*,
97 F.4th 268 (5th Cir. 2024) ...............................................................4

*Va. Off. for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011)...............................................................29, 31, 32

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .....................................2, 25, 34, 47

*Villas at Parkside Partners v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013) ..............................................................46

vii

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ..................................................................15

*Wilson v. State Bar of Ga.*,
    132 F.3d 1422 (11th Cir. 1998) ..................................................................24

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ...........................................23, 24

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ................................................................................24

**Federal Statutes**

8 U.S.C. § 1101(a) ...........................................................................................4

8 U.S.C. § 1101(a)(13)(A) .............................................................................17

8 U.S.C. § 1101(a)(15)(T).................................................................................5

8 U.S.C. § 1101(a)(15)(U) ................................................................................5

8 U.S.C. § 1103(a)(1)......................................................................................30

8 U.S.C. § 1158(a)(1).........................................................................................5

8 U.S.C. § 1158(d) ............................................................................................5

8 U.S.C. § 1181.................................................................................................4

8 U.S.C. § 1182.................................................................................................4

8 U.S.C. § 1182(a)(6)........................................................................................5

8 U.S.C. § 1182(D)(5) ......................................................................................4

8 U.S.C. § 1185.................................................................................................4

8 U.S.C. § 1223...............................................................................................17

8 U.S.C. § 1224 .................................................................................................4

8 U.S.C. § 1225 ............................................................................................4, 17

8 U.S.C. § 1225(b)(1) ........................................................................................5

8 U.S.C. § 1227 .................................................................................................5

8 U.S.C. § 1228 .................................................................................................5

8 U.S.C. § 1229(a)(1)(F)(i) ...............................................................................5

8 U.S.C. § 1229(a)(2)(A) ...................................................................................5

8 U.S.C. § 1229a ...............................................................................................5

8 U.S.C. § 1229b ..........................................................................................5, 17

8 U.S.C. § 1231(a)(5) ........................................................................................5

8 U.S.C. § 1231(b)(3) ........................................................................................5

8 U.S.C. § 1255(h) ...........................................................................................17

8 U.S.C. § 1255(m) ..........................................................................................17

8 U.S.C. § 1302 ...........................................................................................5, 43

8 U.S.C. § 1303 ...........................................................................................5, 43

8 U.S.C. § 1304 ...........................................................................................5, 43

8 U.S.C. § 1305 ...........................................................................................5, 43

8 U.S.C. § 1306 ...........................................................................................5, 43

8 U.S.C. § 1323 ...........................................................................................6, 42

8 U.S.C. § 1324 .........................................................................................25, 46

8 U.S.C. § 1324(a)(1)(A)(i) ....................................................................6, 25, 42

8 U.S.C. § 1324(a)(1)(A)(ii) .............................................................6, 25, 42, 46

8 U.S.C. § 1324(a)(1)(A)(iii) ...................................................................6, 7, 42

ix

8 U.S.C. § 1324(a)(1)(A)(iv) ..................................................6, 42

8 U.S.C. § 1324(a)(1)(A)(v) ..................................................6, 42

8 U.S.C. § 1324(a)(1)(B) ..................................................7, 42

8 U.S.C. § 1324(a)(1)(B)(i) ..................................................6

8 U.S.C. § 1324(a)(1)(B)(ii) ..................................................6

8 U.S.C. § 1324(a)(1)(B)(iii) ..................................................6

8 U.S.C. § 1324(a)(1)(B)(iv) ..................................................6

8 U.S.C. § 1324(a)(1)(C) ..................................................6

8 U.S.C. § 1324(a)(2) ..................................................6, 42

8 U.S.C. § 1324(a)(3) ..................................................6, 42

8 U.S.C. § 1324(a)(4) ..................................................6, 42

8 U.S.C. § 1324(b) ..................................................6, 7

8 U.S.C. § 1324(b)(1) ..................................................6, 7, 42

8 U.S.C. § 1324(b)(3) ..................................................5, 42

8 U.S.C. § 1324(b)(3)(A) ..................................................6

8 U.S.C. § 1324(b)(3)(B) ..................................................6

8 U.S.C. § 1324(b)(3)(C) ..................................................6

8 U.S.C. § 1324(c) ..................................................6, 42, 44

8 U.S.C. § 1324(d) ..................................................6, 42

8 U.S.C. § 1324(e) ..................................................42

8 U.S.C. § 1325 ..................................................5, 42

8 U.S.C. § 1326 ..................................................5, 42

8 U.S.C. § 1327 ..................................................6, 42

x

8 U.S.C. § 1328 .................................................................................6, 42

8 U.S.C. § 1329 ............................................................................6, 30, 42

8 U.S.C. § 1357(g)(1) .............................................................................49

8 U.S.C. § 1357(g)(3) .............................................................................48

8 U.S.C. § 1357(g)(5) .............................................................................48


**State Statutes**

Ariz. Stat. § 13-1509(F) .........................................................................40

Fla. Stat. § 775.082(3) ..............................................................................7

Fla. Stat. § 787.07...........................................................................*passim*


**Other Authorities**

*ICE. Check Your County*,
     Tallahassee Democrat (June 17, 2025)...........................................50

Cheryl McCloud, Florida Leads US in Local Law Enforcement
     Agencies Partnering with ICE. Check Your County, Tallahassee
     Democrat (June 17, 2025), https://perma.cc/TW3C-H5QT. ...........50

Nat'l Inst. of Just., Dep't of Just., *Undocumented Immigrant
     Offending Rate Lower Than U.S.-Born Citizen Rate* (Sept. 12,
     2024), https://perma.cc/GRD7-K7WE ...........................................51

Merriam Webster Dictionary ...................................................................18

Oxford Eng. Dictionary (2023).................................................................18

U.S. Customs & Border Prot., *Frontline Against Fentanyl* (last
     modified May 22, 2025), https://perma.cc/4NAU-9GSY ...............51

Webster's New Int'l Dictionary.................................................................18

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument, which will help the Court decide the important legal issues raised by this case.

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiffs-Appellees remove the following persons who were included in Defendants-Appellants' CIP:

1. Kacou, Amien

2. Wiese, Evelyn

Plaintiffs-Appellees add the following person who was not included in Defendants-Appellants' CIP:

1. McVay, Bradley

2. Sarabia Roman, Oscar

3. Steinberg, Hannah

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: October 15, 2025

/s/ *Spencer Amdur*
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

*Counsel for Plaintiffs–Appellees*

xiii

## STATEMENT OF THE ISSUES

This Court has held that Congress preempted all state regulation of the "transport and movement of aliens." *Ga. Latino Alliance for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) (striking down state's immigrant transport law on this basis); *United States v. Alabama*, 691 F.3d 1269, 1285–88 (11th Cir. 2012) (same). Yet Florida enacted Section 10 of Senate Bill 1718, which imposes criminal penalties on a person who "transports into this state" a noncitizen who "entered the United States in violation of law and has not been inspected by the Federal Government." Fla. Stat. § 787.07. The issues on appeal are:

1. Whether the district court correctly concluded that Plaintiffs likely have standing and a cause of action in equity.

2. Whether the district court correctly concluded that Section 10 is likely:

    a. field preempted for intruding on the field of immigrant entry, movement, and residence, and

    b. conflict preempted for creating unilateral state regulation of immigration.

3. Whether the district court abused its discretion in concluding that the equities favor an injunction.

1

**INTRODUCTION**

This Court has squarely held that states cannot regulate the transport of immigrants, because "Congress has provided a full set of standards to govern the unlawful transport and movement of aliens." *Ga. Latino Alliance for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) [hereinafter "*GLAHR*"] (internal quotation marks omitted) (striking down state law that regulated the transport of immigrants); *United States v. Alabama*, 691 F.3d 1269, 1285–88 (11th Cir. 2012) (same). Likewise, other Circuits have uniformly invalidated immigrant transport laws on preemption grounds. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023–29 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 530–32 (4th Cir. 2013); *see also Fuentes-Espinosa v. People*, 408 P.3d 445 (Colo. 2017); *United States v. Texas*, --- F. Supp. 3d ---, 2025 WL 2170007 (W.D. Tex. July 31, 2025). But Florida's law, Section 10 of State Bill 1718 ("Section 10"), does precisely what this Court held prohibited: It regulates the transport of immigrants. The district court correctly applied this Court's precedents and enjoined Section 10's enforcement.

Defendants offer no reason to disturb that result. They spend much of their brief arguing for an interpretation of the statute that would make it apply to a narrower set of immigrants. But that is irrelevant to preemption: Section 10 regulates the entry and movement of immigrants—a field where no state regulation

2

is permitted—regardless of what precise set of immigrants it applies to. And as to standing, this Court has been clear that a defendant cannot deprive a plaintiff of standing by advancing a narrow interpretation of a statute. It is black-letter law that a plaintiff need only show that they are "arguably" subject to the law, and the district court explained that Plaintiffs easily met this burden. App. 261–63.

On the merits, Defendants concede that the field of immigrant transport is preempted under this Court's precedents. Their main argument is that Section 10 does not operate in that field, because in addition to regulating immigrants, it regulates—perhaps only theoretically—U.S. citizens who enter the country illegally. Judge Altman correctly rejected the idea that states could "circumvent field or conflict preemption by marginally expanding a regulation to cover a small, additional category" outside the preempted field. App. 274. Section 10 undisputably regulates immigrant transport—and is thus preempted—regardless of whether it also touches some "miniscule" number of U.S. citizens. App. 273.

Defendants also challenge Plaintiffs' equitable cause of action. Florida has made the same arguments in *Florida Immigrant Coalition v. Uthmeier*, No. 25-11469 (11th Cir.), which may resolve some of the issues in this case. But no court in the country has agreed with Defendants' view, which would eliminate most of the preemption cases that courts routinely adjudicate. Judge Ruiz exhaustively rejected Defendants' theory. App. 362–71.

3

Section 10 threatens to impose severe harm on communities across Florida and nearby states. Defendants call it a "human smuggling" law. Br. 2. But in reality, it prohibits people from transporting their friends, family, co-workers, and others for the most ordinary purposes, like going to school, to work, or to visit loved ones. Its enforcement would cause immeasurable harm to countless families. This Court should affirm the preliminary injunction.

**STATEMENT OF THE CASE**

### A. Congress's Pervasive Regulation of Noncitizens' Entry, Movement and Residence.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress exercised that power in the Immigration and Nationality Act ("INA"), which "is comprehensive, complex, and national in scope." *United States v. Texas*, 97 F.4th 268, 285 (5th Cir. 2024), *injunction aff'd*, 144 F.4th 632 (5th Cir. 2025), *vacated and rehearing en banc granted*, 150 F.4th 656 (5th Cir. 2025).

Congress has exhaustively regulated noncitizens' "entry, movement, and residence" in the United States. *GLAHR*, 691 F.3d at 1264. It has specified exactly who may and may not enter the country. *See, e.g.*, 8 U.S.C. §§ 1101(a) (visa categories), 1182 (inadmissibility grounds), 1182(d)(5) (parole). It has laid out detailed procedures for entry. *See, e.g.*, 8 U.S.C. §§ 1181, 1224, 1225, 1185. And

4

it has provided a range of consequences for noncitizens who enter unlawfully, both criminal and civil. *See* 8 U.S.C. §§ 1325, 1326, 1182(a)(6). Once in the country, federal law allows immigrants to live in any state they choose, but requires them to comply with a number of federal regulations related to their immigration status. *See, e.g.*, 8 U.S.C. §§ 1229(a)(2)(A) (attending immigration court hearings); 1229(a)(1)(F)(i) (updating federal officials on residence); 1302–1306 (registration). And Congress provided noncitizens who entered unlawfully with a number of avenues to obtain lawful status and make their residence permanent. *See, e.g.*, 8 U.S.C. §§ 1158(a)(1), (d),1229b, 1231(b)(3), 1101(a)(15)(U), (T).

Finally, Congress has provided extensive rules for which citizens can be removed from the United States, and the procedures for making that determination. It has laid out multiple kinds of removal proceedings. *See* 8 U.S.C. §§ 1225(b)(1) (expedited removal); 1229a (immigration court); 1231(a)(5) (reinstatement of removal); 1228 (administrative removal). And it has specified which noncitizens can be prevented from residing in the United States. *See, e.g.*, 8 U.S.C. § 1227 (grounds of deportability). These and many other removal provisions establish a "comprehensive statutory framework governing alien removal." *Alabama*, 691 F.3d at 1294–95 (collecting statutes).

These entry, residence, and removal restrictions include detailed rules and procedures to govern the movement of noncitizens into and within the United States.

5

As part of its entry regulations, Congress has enacted criminal penalties for those who help immigrants enter the country unlawfully. *See* 8 U.S.C. §§ 1323, 1327, 1328. And as part of its removal scheme, Congress has enacted criminal penalties for those who help immigrants evade removal. *See* 8 U.S.C. § 1324(a)(1)(A)(ii)–(v). These movement provisions are carefully limited. They do not bar transport generally, only transport "in furtherance of" a noncitizen's unlawful entry or presence. 8 U.S.C. § 1324(a)(1)(A)(ii); *see also* 8 U.S.C. § 1324(a)(1)(C) (religious exemptions). Congress has thus chosen not to criminalize the pursuit of basic life necessities, only transport that helps noncitizens evade the removal process. Congress also crafted a detailed set of penalties for violating these provisions. 8 U.S.C. § 1324(a)(1)(B)(i)–(iv), 1324(a)(2)–(4). And Congress has imposed careful procedures for their enforcement, including seizure rules, 8 U.S.C. § 1324(b), rules of evidence, 8 U.S.C. § 1324(b)(3)(A)–(C), (d), and prosecution in federal court, 8 U.S.C. § 1329. Congress has even specified the role of state officers in this scheme: They may arrest for federal crimes, 8 U.S.C. § 1324(c), but nothing else.

### B. Section 10 of Senate Bill 1718

Section 10 of Senate Bill 1718 makes it a state crime for a person to "knowingly and willfully transport[] into [Florida] an individual whom the person knows, or reasonably should know, has entered the United States in violation of law

6

and has not been inspected by the Federal Government since his or her unlawful entry from another country." Fla. Stat. § 787.07.

Section 10 goes beyond federal law in numerous ways. Although federal law prohibits transporting a noncitizen only "in furtherance of" their unlawful presence, 8 U.S.C. § 1324(a)(1)(A)(iii), Section 10 prohibits transporting the specified noncitizens for *any* purpose, including transportation for everyday purposes like visiting friends, attending church, going to the "supermarket," or any other activity. App. 276. Section 10 omits federal law's exemption for religious activities. It employs different evidentiary rules and different penalties.[1] It imposes mandatory detention where federal law does not. Fla. Stat. § 787.07(7). And Section 10 turns on whether a person has been inspected "since" an unlawful entry—a category that does not appear anywhere in federal law. *See* App. 265 ("[I]mmigration law does not contain that category or say what it means.").

### C. Procedural History

Plaintiffs in this case include individuals as well as a Florida membership organization, the Farmworker Association of Florida ("FWAF"). The individual

---

[1] *Compare* Fla. Stat. § 775.082(3)(d), (e) (penalties up to 5 or 15 years), *with* 8 U.S.C. § 1324(a)(1)(B) (penalties up to 5, 10, or 20 years based on different categories). Section 10 does not incorporate the evidentiary rules in 8 U.S.C. § 1324(b) or (d), and it permits a novel inference that a suspect had the requisite knowledge of the passenger's immigration status if they present a false ID to a law enforcement officer. Fla. Stat. § 787.07(6).

plaintiffs are subject to prosecution under Section 10 because they transport people who entered the country without inspection, and who arguably have not been inspected by the federal government since their entry. App. 254–57. Their passengers have a variety of immigration situations. Some have never had contact with the federal government, others have removal proceedings pending but not completed, and others have merely submitted an application to the federal government but have received no substantive response. App. 128, 143, 147, 152–53, 160, 254–57.

The same is true of FWAF's members, many of whom are farmworkers who must frequently travel to follow the harvest seasons for crops. App. 119. They thus regularly transport passengers who arguably have not been inspected by the federal government since their entry. App. 120–22. As with the individual plaintiffs' passengers, their passengers also have a variety of immigration situations. App. 120–22.

In addition to harming its members, Section 10 harms FWAF's own business activities. App. 123–24. Helping its thousands of members navigate Section 10 threatened to shut down, or at least severely curtail, entire other areas of FWAF's work. App. 123–24. Section 10 also harms FWAF because, based on interviews

8

with organizers and members, approximately one hundred member families will not return to Florida if Section 10 is in effect.  App. 125.

The defendants are Florida's attorney general, statewide prosecutor, and state attorneys for each of Florida's twenty judicial circuits.  Plaintiffs also sued the Governor, but he was dismissed from the case and is not a party to this appeal.  App. 251.

The case was originally assigned to Judge Altman of the United States District Court for the Southern District of Florida, who granted Plaintiffs' motion for a preliminary injunction.  App. 249.  The district court concluded that three of the individual plaintiffs had standing and FWAF had organizational standing based on the harm the statute would cause to the organization.  App. 253–65.  The district court held that the law was likely both field and conflict preempted.  App. 269–77. The court initially issued a statewide injunction, but following supplemental briefing, limited the injunction to FWAF, members of FWAF, and the individual plaintiffs for which it found standing.  App. 349.

The case was later reassigned to Judge Ruiz.  In a subsequent order, the district court concluded that two other individual plaintiffs had standing, and that FWAF had associational standing based on harms to its members.  App. 375–82.  The

district court also held that the plaintiffs had an equitable cause of action to bring their preemption claims. App. 362–71.

## STANDARD OF REVIEW

This Court reviews a district court's "grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020) (describing "narrow" and "deferential" review). To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant unless the injunction is granted; (3) that the threatened injury outweighs the harm that the preliminary injunction would cause the opposing party; and (4) that the injunction would not adversely affect the public interest. *Id.* at 1271.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's preliminary injunction. As the district court correctly held, the individual plaintiffs have standing because each of them is subject to prosecution under Section 10. Because the same is true of FWAF's members, FWAF has associational standing. FWAF also has organizational standing because Section 10 directly harms FWAF by disrupting its programs and decreasing its membership.

10

Defendants advance a narrow interpretation of the statute in an attempt to defeat standing, but their interpretation is irrelevant here. Multiple plaintiffs would still have standing even if the interpretation were correct. Others easily satisfy the low bar for standing, which only requires that their conduct is "arguably proscribed" by Section 10, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–63 (2014) (cleaned up)—something that is plainly true for every plaintiff. App. 261-63.

Additionally, as the district court correctly held, Plaintiffs have a well-established equitable cause of action to seek prospective relief against the enforcement of Section 10 under *Ex parte Young*, 209 U.S. 123 (1908). Defendants rely on the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) but, as this Court has reaffirmed since *Armstrong*, private parties have an equitable cause of action to bring preemption claims. *See Newton v. Duke Energy Fla.*, 895 F.3d 1270, 1275–76 (11th Cir. 2018).

The district court also was correct in finding Section 10 preempted. This Court has already held that state laws criminalizing the transportation of immigrants are field and conflict preempted, and here Section 10 clearly regulates within that field and conflicts with Congress's decision not to criminalize this conduct and to leave control of the immigration system in the hands of federal officers. Defendants contend that Section 10 is valid because, in addition to regulating within the preempted field, it also theoretically regulates a "miniscule" number of U.S. citizens

11

who enter the country illegally. App. 273. The district court correctly rejected that non-sequitur and explained that a state cannot regulate in a preempted field just by adding a marginal amount of additional regulation.

Finally, the district court acted well within its discretion in weighing the balance of equities and the public interest. Plaintiffs face imminent and irreparable harm from arrest, detention, and prosecution under S.B. 4-C. Defendants face no comparable harm and have no cognizable interest in enforcing a preempted law. This Court should affirm the district court's preliminary injunction.

ARGUMENT

## I.    DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT.

### A. Plaintiffs Have Standing.

As the district court correctly held, the individual plaintiffs have standing because each of them is subject to prosecution under Section 10. App. 253–65, 382–83. The district court was also correct that FWAF has standing, both because its members are subject to prosecution under Section 10, and because Section 10 threatens to upend its operations. App. 263–65 (Altman, J.); App. 375–79 (Ruiz, J.).

A plaintiff has standing when (1) they have "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) their intended future conduct is "arguably . . . proscribed by the statute," and (3) "the threat of future enforcement . . . is substantial." *Susan B. Anthony List*, 573 U.S. at 160–64. As this

12

Court has repeatedly held, these factors are satisfied when plaintiffs challenge a law that arguably criminalizes their own activities. *See Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385, at \*2 (11th Cir. 2025) (noncitizens subject to prosecution under state immigration statute likely had standing); *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1302 (11th Cir. 2025) (fisherman subject to prosecution under state law had standing).

Plaintiffs easily meet their burden to show that at least one plaintiff has standing. *See Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

### i. Plaintiffs Have Standing Even Under Defendants' Narrow Construction of the Statute.

Defendants' primary standing argument is that Section 10 could be interpreted narrowly, in a way that would mean that some of the Plaintiffs' passengers have been "inspected" since entry. Br. 14–30. But that response fails at the outset, because even accepting their narrow construction for these purposes, *but see infra* Part I.A.ii, multiple Plaintiffs would *still* have standing.

For instance, Plaintiffs Mendoza and Morales transport people who have never had contact with the federal government. App. 128. As the district court explained, their "regular[]" course of transit in violation of Section 10, and their intention to continue, easily establishes standing. App. 257 n.4 (Mendoza); App.

13

382–83 (Morales). No definition of "inspected" would include people "who have never had any contact with immigration authorities." App. 257 n.4 (quotation marks omitted). FWAF has standing on the same grounds, as its members regularly transport noncitizens who have not had contact with federal officials. App. 121–22; App. 376 (finding associational standing on this basis). All of these Plaintiffs are subject to prosecution even under Defendants' construction because their passengers have not received "an initial determination on admissibility." Br. 9, 17.

This alone is enough to settle the standing issue, and it renders Defendants' extensive interpretive arguments irrelevant. Defendants notably do not address this in their brief. Below, Defendants argued that these plaintiffs lacked standing because they did not identify a specific date and time for their transportation plans. But as the district court explained, this Court has been clear that a plaintiff need only show that they engage in the relevant conduct "on a regular basis" and "expect[] to do so in the near future. . . . . That is enough." App. 257 n.4 (quoting *Houston v. Marod Supermkts., Inc.*, 733 F.3d 1323, 1340 (11th Cir. 2013)); *see Daniels*, 127 F.4th at 1302 (finding standing where fisherman "regularly" used restricted nets and

14

"will continue to" do so); *GLAHR*, 691 F.3d at 1258 (same for plaintiff who "regularly transports" noncitizens).

### ii. Defendants' Narrow Construction Cannot Defeat Standing for the Remaining Plaintiffs.

In any event, Defendants' construction cannot eliminate standing for *any* of the Plaintiffs, because they are all at risk of prosecution under Section 10.

1. Defendants advance a variety of convoluted arguments for why Section 10 could be read to exclude them. But these efforts miss the key legal standard here: For standing, a plaintiff need only show that the law "*arguably* proscribes their conduct." App. 259 (quoting *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1137–38 (11th Cir. 2023)). This standard is well-established in this Circuit and every other. *See id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159); *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) ("*Susan B. Anthony List* makes clear that courts are to consider whether the plaintiff's intended conduct is 'arguably proscribed' by the challenged statute, not whether the intended conduct is in fact proscribed."); *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 217–18 (5th Cir. 2023) (Even where the plaintiff's "interpretation [of a statute] [is] not . . . the best interpretation, the test doesn't require that"); *Shen v. Simpson*, 687 F.Supp.3d 1219, 1228–29, 1232–33 (N.D. Fla. 2023) (same). Requiring only that conduct be "arguably proscribed" makes sense, because a party who could be subject to criminal penalties need not "expose himself to actual arrest or prosecution" just

15

because the statute is ambiguous. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).[2]

All of the remaining Plaintiffs easily clear this low threshold. There is no dispute that their passengers "entered the United States in violation of law." Fla. Stat. 787.07. And there is no clear indication that any of their passengers have already "been inspected" since. *Id.* Some have pending removal proceedings which have not reached any decision yet. App. 152–53, 256-57, 382 (Rios and Carrillo); App. 121–22, 376–77 (FWAF members). Others have submitted applications but have never spoken to federal officials or received any substantive response. App. 147, 255 (Aragon); App. 128, 254 (Mendoza); App. 143, 383 (Morales); App. 160, 256-57, 382 (Rios and Carrillo); App. 122, 376–77 (FWAF members).

To defeat their standing, Defendants would have to establish that Section 10 *clearly* deems these passengers to have already been inspected. *Cf. Edger v. McCabe*, 84 F.4th 1230, 1236 & n.4 (11th Cir. 2023) (officer had "arguable probable

_____

[2] Defendants contend that this Court should certify this case to the Florida Supreme Court so that it may interpret Section 10. But certification is unnecessary here, because Plaintiffs would have standing even under Defendants' construction of Section 10, because Section 10 is field and conflict preempted regardless of whether their construction is correct, and because resolving this standing issue does not require any definitive interpretation of the statute—only the normal determination of whether Plaintiffs' conduct is "arguably proscribed." By contrast, in *Dream Defenders v. Gov. of the State of Fla.*, 57 F.4th 879, 892-93 (11th Cir. 2023), this Court certified a question that was critical to determining the constitutionality of a statute.

cause" where lack of probable cause was not "clearly established"). But both tools they invoke—federal immigration law and dictionaries—point the other way.

Nothing in federal law provides that any of the Plaintiffs' passengers have been "inspected" since entry. In the INA, the term "inspection" is generally used to describe a process that occurs at the border, as a precursor to admission or parole into the United States. *See, e.g.*, 8 U.S.C. §§ 1101(a)(13)(A), 1223, 1225.[3] The INA does not describe a person as "inspected" merely because they have submitted a form or have been placed in removal proceedings. As a result, none of the Plaintiffs' passengers have been "inspected" as the INA uses that term. App. 261–63. And in fact, the INA provides that noncitizens can obtain lawful immigration status despite *lacking* any prior inspection. *See, e.g.*, 8 U.S.C. §§ 1229b, 1255(h), 1255(m). Indeed, in district court, Defendants disclaimed any reliance on the INA in interpreting Section 10: They claimed that "[d]ictionary definitions, rather than the INA, are the proper source to interpret the term 'inspected.'" App. 177 n.4 (agreeing that "the Legislature expressly declined to import the INA definition of 'inspect' into § 787.07") (cleaned up).

But that doesn't help: Dictionaries similarly show that Plaintiffs' passengers have at the very least *arguably* not been inspected. As the district court explained

---

[3] Defendants' citations are not to the contrary. *See, e.g.*, *In re Quilantan*, 25 I & N Dec. 285, 293 (BIA 2010) (discussing whether noncitizen had been inspected at the border); *In re G*, 3 I & N Dec. 136, 138 (BIA 1948) (same).

and "[a]s Defendants concede[d], to 'inspect' something is to examine it officially, to look carefully," App. 261 (quoting Webster's New Int'l Dictionary) (cleaned up), or "to view closely in critical appraisal," App. 262 (quoting Merriam Webster Dictionary); *see Inspect*, Oxford Eng. Dictionary (2023) (similar).  No ordinary reader would say that federal officials have already "inspected" a person they have never encountered or spoken with.  No one would say that an official has "look[ed] carefully" at an application they have received but not opened or reviewed.  No one would say that a person with pending proceedings that have not reached any decision has *already* been "examine[d] . . . officially."  App. 261.  Florida courts typically give statutory terms their "plain and ordinary meaning."  *Tsuji v. Fleet*, 366 So. 3d 1020, 1028 (Fla. 2023).  And here, that meaning subjects Plaintiffs to a clear risk of prosecution.

Defendants' contrary arguments are conspicuously thin.  They point to nothing in federal law that describes Plaintiffs' passengers as having been "inspected since" entry.  Elsewhere they insist that Section 10 is not modeled on federal immigration law.  *See* Br. 42–43; App. 177 & n.4.  They cite a 70-year-old definition of "inspect," and then immediately move on to definitions of *other* words, like

18

"look."    Br. 15–16.    But what English speaker would say that someone has "inspected" every person they merely "look" at?

Defendants' failure to defeat standing is further illustrated by their shifting interpretations of the statute.  In district court, they argued that Section 10's "inspect" condition was satisfied any time federal officials simply "had the *opportunity* to examine the person," even if no such examination had taken place.  App. 191 (emphasis added); App. 261–62, 267–68 & n.14.  Now they have changed course, and argue that mere opportunity is not enough and that instead Section 10 requires an "initial determination on admissibility."  Br. 17, *see id.* at 15, 16, 20.  Defendants' changed interpretation confirms that Section 10 does not *clearly* exclude Plaintiffs from its coverage.

Defendants similarly get nowhere by arguing that Section 10 should be interpreted to avoid preemption.  Br. 22.  As explained below, this interpretive question has zero bearing on preemption, because Section 10 enters the preempted field and conflicts with federal law regardless of which set of immigrants it applies to.  *Infra* Part II.

The district court was correct to reject all of these arguments.  To defeat standing, Defendants would have to show that their interpretation is the only viable

19

one. But they can barely show that their interpretation is plausible, much less unavoidable.

2. Defendants' narrowing construction also cannot defeat FWAF's standing, which is established on two independent grounds.

First, as Judge Ruiz concluded, App. 375–79, FWAF has associational standing based on harm to its members.[4] *Contra* Br. 30 (claiming district court "did not reach" associational standing). As the district court explained, multiple FWAF members "regularly" transport undocumented immigrants, some of whom are subject to Section 10 even under Defendants' interpretation, and all of whom are at least "arguably" covered by the law. App. 119, 121–22; *see supra* Part I.A. That alone is sufficient for standing. *See United States v. Texas*, 2025 WL 2170007, at *8 (concluding that group whose "members . . . transport groups of migrants" had associational standing to challenge immigrant transport ban).

Second, FWAF has organizational standing. The Court need not reach this issue if it finds that FWAF has associational standing. But organizational standing is equally clear. *See GLAHR*, 691 F.3d at 1259-60 (finding standing on similar basis). As Judge Altman held, FWAF faces major harms to its own operations. App.

---

[4] An organization has associational standing if its members have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and its claim does not require the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants do not contest the second and third factors.

20

261–65. Section 10 "directly affect[s] and interfere[s] with [FWAF's] core business activities," *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024), because, as Defendants did not contest, Section 10 had left the organization almost completely unable to perform its regular work and provide its ordinary services. After the passage of Section 10, FWAF staff had to devote nearly all their resources to helping members navigate the new law and the criminal penalties it could foist on them and their loved ones. App. 123–24. This new line of work "[took] up significant staff member time" and "delay[ed] and, in some instances, prevent[ed] staff members from completing other work necessary to the organization." App. 124. As a result, staff were forced to abandon their normal services, "result[ing] in delayed Medicaid applications, food stamps applications, and applications for U.S. Department of Agriculture Farm and Food Worker Relief." App. 124. Consequently, Section 10 would "continue to drain valuable resources from FWAF that would otherwise go to [its] core programs." App. 123; *see* App. 117 (unable to make a critical hire). This kind of "programmatic disruption" is a "paradigmatic example[] of organizational injury-in-fact." *United States v. Texas*, 2025 WL 2170007, at *8.

The Supreme Court re-affirmed in *Alliance for Hippocratic Medicine* that these same kinds of harm establish organizational standing. 602 U.S. at 395 (standing satisfied where a policy "perceptibly impair[s an organization's] ability to

21

provide . . . services") (cleaned up).  Such impediments to FWAF's operations are a far cry from the injuries the Supreme Court rejected, such as an "issue-advocacy organization" "expending money to gather information and advocate against the defendant's action."  602 U.S. at 394-95.  FWAF faces real operational harm, not just a setback to abstract advocacy goals.

Section 10 would also harm FWAF because, based on its interviews with organizers and members, approximately 100 member families will not return to Florida if Section 10 remains in effect, because they do not want to risk criminal liability.  App. 125.  FWAF will thus face lower membership numbers and lower dues, which will cause direct financial harm to the organization.  *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663–64 (9th Cir. 2021) (finding organizational standing where the challenged policy would have caused the organization to lose clients and funding).

3.    Defendants argue that Plaintiffs do not face a "credible threat of prosecution" under *Susan B. Anthony*, again emphasizing their narrowing interpretation.  Br. 28–30.  But as explained above, that is plainly not true of Plaintiffs Mendoza, Morales, and FWAF members, all of whom transport people who have never had contact with the federal government, and who therefore are

22

subject to prosecution even under Defendants' interpretation. That is sufficient to reject this argument.

Even as to the other Plaintiffs, the Attorney General's narrowing construction cannot prevent them from showing a credible threat of prosecution. For one thing, the Attorney General's current litigation position does not even bind the Attorney General, much less the hundreds of police, prosecutors, and judges who would enforce Section 10, and so it cannot meaningfully protect Plaintiffs from the threat of harm. *See State v. Fam. Bank of Hallandale*, 623 So. 2d 474, 478 (Fla. 1993) (stating that an official Attorney General opinion "is not binding on a court"); *Stenberg v. Carhart*, 530 U.S. 914, 940–41 (2000) (Attorney General's interpretation of statute "does not bind the state courts or local law enforcement"). And beyond that, it would eviscerate the black-letter "arguably proscribed" standard if the government could defeat standing simply by offering any interpretation that excludes the plaintiff, no matter how implausible.

Because their conduct is subject to criminal penalties under the plain language of Section 10, Plaintiffs' threat of prosecution is not "imaginary or speculative." *Babbitt*, 442 U.S. at 298. Moreover, "Florida has . . . vigorously defended [Section 10] in court," which further supports an inference that the state intends to enforce the law. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc). Thus, the district court was right to reject this argument and find that

23

Plaintiffs have shown a credible threat of prosecution, "a standard which [this Court] ha[s] described as 'quite forgiving.'"  *Id.* (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)); *see* App. 256 n.3; *see also Daniels*, 127 F.4th at 1303 (finding pre-enforcement standing where prosecution was "more than remotely possible") (cleaned up).

### iii. Preemption Claims Are Not Categorically Barred as Defendants Claim.

Defendants' next standing objection would mark an enormous sea change in preemption litigation, one that no court has endorsed.  They claim that because pre-enforcement standing requires "an intention to engage in a course of conduct arguably affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159 (cleaned up), plaintiffs cannot sue based on a "preemption claim," and may only sue based on claims under constitutional provisions like the First Amendment.  Br. 9–10, 24.  But no court has accepted that illogical view, which ignores the nature of preemption and the long history of such litigation.

Plaintiffs assert a constitutional interest based on the Supremacy Clause, U.S. Const. art. VI, cl. 2, which provides Plaintiffs a "federal right to be free from" unconstitutional state regulation like Section 10.  *Murphy v. NCAA*, 584 U.S. 453, 479 (2018).  Indeed, Plaintiffs here seek to transport their passengers for critical purposes, including "to church, court, hospitals, schools, lawyers' offices, and to other appointments," including immigration appointments.  App. 143, 128.  And the

Supreme Court has made clear that private parties have standing to "vindicate [their] own *constitutional interests*" in federalism principles, and a "direct interest in objecting to laws that upset the constitutional balance." *Bond v. United States*, 564 U.S. 211, 220–22 (2011) (emphasis added); *cf. Collins v. Yellen*, 594 U.S. 220, 245 (2021) (similar). That is why courts routinely find that plaintiffs satisfy *Susan B. Anthony* when they bring pre-enforcement challenges to state laws that violate the Supremacy Clause or other federalism principles. *See, e.g.*, *Daniels*, 127 F.4th at 1302; *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) (general "federalism principles" provided constitutional interest for pre-enforcement standing); *Valle del Sol*, 732 F.3d at 1015.[5]

Defendants' peculiar position would mean that private parties of all kinds would be constitutionally barred from challenging preempted state laws. But it is well-established that courts can, and do, adjudicate such claims. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (collecting cases); *Arizona v. Inter*

---

[5] Defendants also assert that pre-enforcement review is not available because Plaintiffs are violating 8 U.S.C. § 1324, which "criminalizes the same conduct" as Section 10. Br. 24. That is triply wrong: A plaintiff can challenge a preempted state statute even where her conduct might violate federal law. But here, § 1324(a)(1)(A)(ii) only bars transport that is "in furtherance" of a legal violation, by concealing the person from federal detection. Plaintiffs have never asserted that they are violating that narrower statute. Section 10, by contrast, has no furtherance element, and so it criminalizes all manner of ordinary daily affairs, like driving children to school. App. 276 (prosecution for driving "to the supermarket"). Defendants have never contested this startling aspect of Section 10, which goes way beyond § 1324.

*Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013); *Daniels*, 127 F.4th at 1302; *Newton*, 895 F.3d at 1273, 1275–76; *GLAHR*, 691 F.3d at 1258–59; *Hisp. Int. Coal. of Ala. v. Gov. of Ala.*, 691 F.3d 1236, 1243–44 (11th Cir. 2012).[6]

## B. Plaintiffs May Sue in Equity.

The district court correctly held that Plaintiffs have an equitable cause of action under *Ex parte Young*. App. 362–71; *see FLIC*, 2025 WL 1625385, at *3. The Supreme Court has confirmed the traditional "power of federal courts of equity" to enjoin preempted laws. *Armstrong*, 575 U.S. at 327–28, 331–32. And this Court has said the same in the immigration context. *See GLAHR*, 691 F.3d at 1261–62; *see also Texas*, 144 F.4th at 661–62 (same); *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1032–33 (D. Idaho 2025) (same); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993, 1000–03 (W.D. Okla. 2025) (same).

Defendants contend that *Armstrong* implicitly abrogated *GLAHR*, *see* Br. 37 n.13, but "*Armstrong* did nothing to alter the central holding in [*GLAHR*]—that plaintiffs can challenge an allegedly preempted state law in federal court prior to enforcement by asserting a cause of action in equity." App. 364–65. This Court has since reaffirmed *GLAHR* and the continued viability of *Ex parte Young* suits raising

---

[6] Defendants cite *Bankshot Billiards v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011), but that case did not even consider, much less reject, the viability of pre-enforcement preemption challenges.

preemption claims. *See Newton*, 895 F.3d at 1275–76 (holding "there exists 'an implied right of action to assert a preemption claim seeking injunctive relief'").

Defendants offer three responses, but none has merit.

First, Defendants claim that a suit in equity can only proceed if a plaintiff "come[s] armed with a federal law endowing it with privately enforceable rights" bestowed "in clear and unambiguous" statutory text. Br. 39 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)). But that confuses the equitable cause of action with a statutory private right of action. The latter is not necessary to advance the former.

In *Armstrong*, the Court reaffirmed that, as a general matter, federal courts of equity can enjoin unlawful executive action—including violations of the Supremacy Clause by state officials—regardless of whether they have a statutory cause of action. 575 U.S. at 326–27. The Court held that the equitable cause of action exists unless Congress acts affirmatively to "preclude the availability of equitable relief." 575 U.S. at 327–28. The Court then *separately* analyzed whether there was a private statutory cause of action, under a completely different rubric, looking to whether the statute contained "rights-creating language." 575 U.S. at 331–32; *see Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025). As Judge Ruiz explained, the Supreme Court's analysis, and subsequent case law, leaves no doubt that plaintiffs do not need a statutory cause of action in order to pursue equitable relief.

27

App. 362–65; *see, e.g.*, *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434–35 (5th Cir. 2023) (plaintiffs have "a cause of action . . . at equity" to seek "relief on preemption grounds" even where the relevant federal statute "does not confer a private right") (cleaned up); *Texas*, 144 F.4th at 661–62 (same); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 22–23 (D.D.C. 2024) (same).

Against this authority, Defendants lean on a single out-of-circuit case, *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), to claim that plaintiffs need a statutory cause of action. Br. 37, 39. But, much like *Armstrong*, *Safe Streets Alliance* explicitly confirmed that "if an individual claims federal law immunizes him from state regulation," a "court may issue an injunction upon finding the state regulatory actions preempted"—precisely the situation here. 859 F.3d at 906 n.19; *id.* at 892 n.5. It merely held that the plaintiffs there, unlike the individual plaintiffs and FWAF members in this case, were not directly regulated. *Id.*; *see Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1000–02 (distinguishing *Safe Streets Alliance*).[7]

Second, Defendants contend that it is improper for Plaintiffs, as private parties, to press their preemption claims in equity. Br. 36–37 (suggesting relevant interests belong to the federal government). Again, that is wrong. "The 'validity of

---

[7] *Safe Streets Alliance*—which, of course, does not bind this Court—also fundamentally misreads *Armstrong*. *See* 859 F.3d at 914–18 (Hartz, J., concurring).

an *Ex parte Young* action' does not 'turn on the identity of the plaintiff.'"  App. 371 n.10 (quoting *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011)). And as explained above, preemption provides private parties with a "federal right to be free from" impermissible state regulation.  *Murphy*, 584 U.S. at 479.  The "constitutional structure of our Government" protects everyone in the country, including private parties.  *Bond*, 564 U.S. at 223; *id.* at 220 (rejecting argument that only states could assert "injury from governmental action taken in excess of the authority that federalism defines").

Third, Defendants contend that the INA forecloses equitable relief.  Br. 35–37.  But they come nowhere near the robust showing the Supreme Court has required to displace the longstanding availability of equity.

*Armstrong* found that Congress had precluded equitable relief based on two factors, neither of which is present here: (1) Congress had created an explicit and exclusive enforcement mechanism, *and* (2) the federal rule in that case was too vague for judicial administration.  *See* 575 U.S. at 326–29.  The Court was clear that both of these conditions were necessary to its holding.  *See* 575 U.S. at 328 (stating that the enforcement scheme "*by itself*" might not preclude equitable relief, "[b]ut it does so when combined with the judicially unadministrable" condition). "Neither condition" is "satisfied here."  *FLIC*, 2025 WL 1625385, at *3; App. 367–71 (exhaustively rejecting this argument and collecting cases).

29

Unlike in *Armstrong*, where Congress had provided an explicit remedy for the violation the plaintiff alleged, the INA does not provide any kind of remedy at all, let alone the "sole remedy," for state laws that intrude on the federal scheme. App. 306 (quoting *Armstrong*, 575 U.S. at 328). While the statute delegates certain immigration-enforcement authorities to the Secretary of Homeland Security, *see* 8 U.S.C. § 1103(a)(1), and assigns prosecution to U.S. Attorneys, *see* 8 U.S.C. § 1329, nothing in these provisions addresses preempted state laws, and nothing suggests that Congress intended to bar equitable actions challenging such schemes. *See Texas*, 144 F.4th at 662 (noting "the absence of such displacement here"). Much of Defendants' brief seems to assume that Plaintiffs are trying to enforce the INA's "criminal prohibition[s]." Br. 37 (cleaned up). But that is wrong. Plaintiffs are not trying to privately prosecute anybody or enjoin allegedly criminal activity. *See* App. 362 ("Plaintiffs are not suing to enforce the criminal provisions of the INA") (cleaned up). They are simply seeking an injunction against a preempted state statute that subjects them to criminal penalties—for which Congress has provided no enforcement scheme of any kind.

Nor is the standard invoked here—that states cannot regulate immigrant transport—"judicially unadministrable" like the broad, nonspecific standard at issue in *Armstrong*. *See* 575 U.S. at 328 (statute required Medicaid payments that were "consistent with efficiency, economy, and quality of care"). It's hard to imagine a

30

simpler and more administrable rule than the one this Court announced in *GLAHR* and *Alabama*.

Defendants do not point to any case precluding equitable relief based on the kind of generalized arguments they offer. In *Seminole Tribe v. Florida*, for example, "Congress ha[d] prescribed a detailed remedial scheme" under the challenged statute and declared that its remedies were the only ones available. 517 U.S. 44, 74–76 (1996). By contrast, *Virginia Office for Protection & Advocacy v. Stewart*, on which Defendants rely, held that *Ex Parte Young* remained available, even though "the Federal Government c[ould] exercise oversight" over the relevant program "and even withhold or withdraw funds." 563 U.S. 247, 255, 256 n.3 (2011).

The Supreme Court's high bar makes sense. Equitable preemption challenges like this one have deep roots, *see Armstrong*, 575 U.S. at 327 (noting the "long history of judicial review of illegal executive action, tracing back to England"), and are a mainstay of federal courts' vital role policing the federal-state boundaries so central to our constitutional structure, *see Shaw*, 463 U.S. at 96 n.14; *GLAHR*, 691 F.3d at 1260–62. If it were enough, as Florida suggests, to merely point to general agency authorities and marginally related enforcement regimes, Br. 23–24, then *Armstrong*'s exception would swallow the rule, leaving states free to flout federal law at will.

31

Defendants also briefly suggest that FWAF cannot sue in equity. Br. 39–40. But through associational standing, FWAF acts as representative of its members, and those members have a clear equitable cause of action to challenge Section 10. *See Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020) (membership organization satisfied *Ex parte Young*); *Texas*, 97 F.4th at 309–10 (Oldham, J., dissenting) (cited by Defendants) (acknowledging that individuals subject to prosecution can invoke equity). Moreover, because the availability of *Ex parte Young* does not "turn on the identity of the plaintiff," *Stewart*, 563 U.S. at 256, courts have rejected such efforts to limit equity to only certain litigants. *See Texas*, 144 F.4th at 660.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

This Court has already held that States are field and conflict preempted from regulating the transportation of immigrants. *See GLAHR*, 691 F.3d at 1264; *Alabama*, 691 F.3d at 1285. Those holdings are fatal to Section 10.[8]

---

[8] Defendants briefly mention the presumption against preemption, Br. 12-13, 41, but no "presumption against preemption applies" to a state's "attempt to regulate immigration." *Alabama*, 691 F.3d at 1296; *see Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (similar); *United States v. Locke*, 529 U.S. 89, 108 (2000) ("an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence").

**A. Section 10 Is Field Preempted.**

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Pursuant to this Court's binding precedent, Section 10 is preempted under both tests.

1.  States are preempted from regulating in the field of "entry, movement, and residence of [noncitizens] within the United States." *GLAHR*, 691 F.3d at 1264; *see id.* at 1263 ("The INA provides a comprehensive framework to penalize the transportation . . . of unlawfully present aliens.").  As part of its broader entry and removal scheme, Congress has "provided a 'full set of standards' to govern the unlawful transport and movement of [noncitizens]." *Id.* at 1264 (quoting *Arizona*, 567 U.S. at 401).  And this Court has thus invalidated multiple state laws that, just like Section 10, attempt to regulate the transport of noncitizens. *See id.*; *Alabama*, 691 F.3d at 1285; *see also id.* at 1294-95 (invalidating state law that attempted to prevent noncitizens from living in the state); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1276 (S.D. Fla. 2025) (enjoining Florida statute that regulated entry into the United States), *stay denied*, 2025 WL 1625385 (11th Cir. June 6, 2025), *stay denied*, 145 S. Ct. 2872 (U.S. July 9, 2025), *appeal pending*, No. 25-

11469. Other Circuits have similarly invalidated immigrant transport laws and laws that regulated other aspects of immigrants' entry and removal. *See, e.g.*, *Valle del Sol*, 732 F.3d at 1022–26 (holding that a state transport law was field preempted); *United States v. South Carolina*, 720 F.3d 518, 530–32 (4th Cir. 2013) (same); *United States v. Iowa*, 126 F.4th 1334, 1348 (8th Cir. 2025) (rejecting state law that regulated entry), *vacated as moot*, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1004–07 (same).

Noncitizens' "entry, movement, and residence" is a field of dominant federal interest and uniquely comprehensive federal regulation. For 150 years, the Court has consistently held that "[p]olicies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (cleaned up); *see Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government"); *Texas*, 144 F.4th at 667 & n.267 (collecting cases). And as explained, Congress has exhaustively regulated noncitizens' entry into, movement within, and removal from the United States. *See supra* Part A (collecting statutes). These transport regulations include detailed rules, procedures, penalties, and exemptions, which "[f]ederal officials" are responsible for enforcing. *Arizona*, 567 U.S. at 396 (describing federal control as "[a] principal feature of the removal system"). And they include important limits. While they

34

serve to bar actions that facilitate unlawful entry or impede removal, they do not go on to criminalize ordinary daily aspects of life for undocumented immigrants. *See United States v. Stonefish*, 402 F.3d 691, 695 (6th Cir. 2005) (Congress did not penalize transport that "merely permit[s] an individual to maintain his existence") (cleaned up); *United States v. Moreno*, 561 F.2d 1321, 1323 (9th Cir. 1977) (Congress avoided imposing "tragic consequences for many American citizens who come into daily contact with undocumented aliens"). The entry and removal scheme, and the transport regulations within it, thus promote enforcement while avoiding the "mistreatment of [noncitizens] in the United States." *Id.* at 395.

This comprehensive system leaves no room for states to decide for themselves which immigrants can be transported into their state, or to add their own consequences for unlawful entry into the country. Section 10 violates these principles in multiple related ways.

First, as the district court held, Section 10 expressly regulates the "transport" of people who "entered" the country illegally. Fla. Stat. § 787.07; App. 273–74. There could scarcely be a more blatant violation of this Court's instruction in *GLAHR* and *Alabama* that states may not regulate the "transport and movement of aliens." *GLAHR*, 691 F.3d at 1264; *Alabama*, 691 F.3d at 1286. Defendants protest that Florida "meticulously crafted its human-smuggling law to avoid the preempted field as *Georgia Latino* defined it." Br. 12. But a "state's attempt to intrude into

35

this area is prohibited," *GLAHR*, 691 F.3d at 1264, and that remains true regardless of how meticulously it tries to sidestep the restrictions of federal law.

Indeed, there is no dispute that Section 10's overwhelming effect is to regulate the movement of immigrants based on their manner of entry.  App. 273 ("Defendants agreed").  The statute thus "directly, substantially, and specifically regulates" within a preempted field.  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992); *see Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 307–08 (1988) (state could not use a general securities law to regulate in the preempted field of natural gas "rates and facilities").  And while Defendants suggest that Section 10's purpose is to regulate customs, not immigration, Br. 42–43, that position "stretches credulity," App. 274.  The statute's title is "An act relating to immigration."  App. 274.  The bill's sponsor, and the Governor upon signing, made clear that its target was "illegal immigration."  App. 274.  And every neighboring provision explicitly mentions "unauthorized immigrants."  Senate Bill 1718 (Fla. 2023); *see GLAHR*, 691 F.3d at 1265 n.11 (rejecting similar argument).  Section 10's clear purpose and effect is to regulate precisely the field that this Court held is preempted.

Second, Section 10 regulates noncitizens' "entry" into the United States, despite Congress's "comprehensive" regulation and the "overwhelmingly dominant federal interest in the field."  *GLAHR*, 691 F.3d at 1264.  This intrusion on the federal scheme is explicit, because by its own terms, Section 10 applies to people who

36

"entered the United States *in violation of law*." FLA. STAT. § 787.07 (emphasis added). States cannot regulate entry "in any respect," *Arizona*, 567 U.S. at 402, because Congress spelled out the consequences of illegal entry in exhaustive detail, and empowered federal officials to balance a range of considerations and choose between those consequences, *id.* at 396–97 (federal discretion must balance "foreign policy" and "immediate human concerns"). Yet through Section 10, Florida has imposed its own consequences for unlawful immigration, by barring people from transporting noncitizens based on their manner of entry, even for purposes—like school, groceries, and medical care—that federal law does not prohibit.

Moreover, by seeking to prevent undocumented immigrants from entering Florida, Section 10 intrudes on "Congress's comprehensive statutory framework governing [noncitizen] removal." *Alabama*, 691 F.3d at 1294. A state cannot decide for itself "that unlawfully present [noncitizens] cannot be tolerated within its territory." *Id.* at 1295. If every state could decide for itself which immigrants can enter the state, it would create an untenable patchwork of "fifty individual attempts" to decide which immigrants can go where, *GLAHR*, 691 F.3d at 1266, and federal control over immigration would be severely eroded. "[T]he immigration scheme would be turned on its head." *Alabama*, 691 F.3d at 1295 n.21.

3. Defendants advance two arguments to try to validate Section 10 despite its clear violation of the Court's precedents. Neither is persuasive.

37

First, Defendants maintain that, even though Section 10 regulates the transport of immigrants, it is nonetheless valid because it *also* regulates, at least in theory, the transport of a tiny number of U.S. citizens who enter the country unlawfully. Br. 44. The district court correctly rejected this bizarre argument. There is "no precedent for the Defendants' view that a party can circumvent field or conflict preemption by marginally expanding a regulation to cover a small, additional category of situations (or people)." App. 274. Defendants continue to cite no precedent to that effect.[9] And that makes sense, because the point of preemption is to disable state laws that interfere with federal regulation. A preempted law's interference is not lessened just because the state adds some "miniscule category" of additional regulation. App. 273 (cleaned up).

Defendants' argument "ignores the basic premise of field preemption—that States may not enter, *in any respect*, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402 (emphasis added). If Defendants were correct, states would be free to regulate in a preempted field as much as they want, as long as they add some tiny regulation outside the field. It's no surprise that no court has

---

[9] Defendants cite *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015), but nothing in that case says states can regulate in a preempted field as long as they also regulate something else. *Oneok* involved a unique federal regime "drawn with meticulous regard for the continued exercise of state power," and the lawsuits there addressed issues which Congress had left "firmly" within the states' regulatory authority. 575 U.S. at 385, 387.

ever endorsed such a glaring loophole.  To the contrary, courts consistently "reject[] efforts by States to avoid preemption by shifting their regulatory focus" and using "an indirect but wholly effective means of" doing what Congress has forbidden.  *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (state could not evade preemption of trucking regulations by regulating terminal operators instead); *see Schneidewind*, 485 U.S. at 307–08 (state law preempted even though it also regulated securities outside the preempted field).

Second, Defendants try to distinguish *GLAHR* and *Alabama* by arguing that, under Defendants' narrow interpretation of Section 10, the statute only covers passengers who are not known to the federal government.  Br. 44–45.  Even if that were true, it does nothing to distinguish this Court's precedents.  The Alabama and Georgia laws this Court struck down similarly targeted passengers who were not known to the federal government.  Indeed, the whole point of those state laws was to criminalize acts that helped noncitizens avoid detection.  *See GLAHR*, 691 F.3d at 1256 (law prohibited "transport[]" that "further[ed] the illegal presence of the [noncitizen]"); *Alabama*, 691 F.3d at 1277 (law prohibited "transport[]" "in furtherance of the unlawful presence of the [noncitizen] in the United States").

More fundamentally, this argument again ignores the basic field preemption rule that states cannot enter the preempted field "in any respect." *Arizona*, 567 U.S. at 402.  Congress preempted states from regulating entry and transport, regardless

39

of which set of immigrants a state targets.  Ignoring this legal rule, Defendants invoke one of the underlying rationales for preemption identified by the Supreme Court—that state regulation in a preempted field interferes with federal discretion. *See id*.  But the entire field remains preempted.  The discretion rationale does not allow Florida to enter a preempted field whenever it thinks "the federal government is not aware of a crime."  Br. 45.

Indeed, if Defendants were right, *Arizona* should have come out the other way. One of the preempted state laws in that case punished immigrants who failed to register with the federal government—i.e. people whom the federal government was not aware of.  567 U.S. at 400.  Defendants mischaracterize *Arizona*'s registration holding as applying only to "law-abiding" noncitizens, Br. 47–48, but the statute at issue in *Arizona* applied *only* to people who lacked permission to remain in the United States.  *See* Ariz. Stat. § 13-1509(F) ("This section does not apply to a person who maintains authorization from the federal government to remain in the United States.") (registration statute in *Arizona*).

4.  Unable to seriously contest that Section 10 is invalid under this Court's precedents, Defendants argue at length that those precedents were wrongly decided. Br. 46–48.  Their criticisms are beside the point.  *GLAHR* and *Alabama* are binding precedent whether Defendants agree with them or not.  Defendants accuse the district court of "stretch[ing]" these precedents based on "rogue judicial policy

40

preference."   Br. 4-5 (quotation marks omitted).   But as explained, these cases squarely prohibit laws like Section 10.

Defendants suggest that a later Supreme Court case, *Kansas v. Garcia*, 589 U.S. 191 (2020), "'undermined'—indeed rejected—the 'reasoning'" of *GLAHR* and *Alabama*.  Br. 45 (quoting *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000)).  But *Garcia* did no such thing, because the case had nothing to do with the field of immigrant transport, or with the "entry, movement, and residence" of noncitizens, *GLAHR*, 691 F.3d at 1264, and so *Garcia* said nothing about whether Congress has occupied that field.  *See Texas*, 144 F.4th at 685 (rejecting reliance on *Garcia*); *Iowa*, 126 F.4th at 1348; *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1005–07 (same).

*Garcia* has little to do with this case.  It involved a prosecution under a state's generally applicable identity-theft statute for using fraudulent social security numbers on tax withholding forms.  589 U.S. at 195, 198–99.  The Court explained that the prosecution had, at best, only the most peripheral overlap with the immigration scheme.  *Id.* at 211–12.  And its field preemption analysis addressed completely different issues from this case.  *Garcia* explained that Congress did not "exclude a State from the entire field of employment verification," and it certainly had not occupied the field of "the information that a State may require employees to provide."  *Id.* at 210 (cleaned up).  The Court also explained that the "submission of

41

tax withholding forms is *fundamentally unrelated*" to the field of "federal employment verification." *Id.* at 208. That analysis does nothing to undermine the conclusion that Congress has comprehensively regulated the entry and movement of noncitizens. And it plainly does not meet this Court's standard for implicitly overruling circuit precedent, because even Defendants do not claim that *Kansas* is "clearly on point" and "clearly inconsistent" with *GLAHR* and *Alabama*. *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1328 (11th Cir. 2020).

As for Defendants' criticisms of those cases, in addition to being irrelevant, they are wrong. Congress has exhaustively regulated the "entry, movement, and residence" of noncitizens, *GLAHR*, 691 F.3d at 1264—the very things that Section 10 regulates. As explained, Congress has enacted a detailed and comprehensive scheme to govern noncitizens' entry into, residence in, and removal from the United States, and the Supreme Court has recognized a dominant federal interest for 150 years. *See supra* Parts A, II.A. Within that system, Congress has enacted an elaborate set of rules for the movement and transport of noncitizens, including a variety of criminal prohibitions, *see* 8 U.S.C. §§ 1324(a)(1)(A)(i)–(v), 1323, 1325–1328, detailed procedures for the implementation of those rules, 8 U.S.C. §§ 1324(b)(1), (b)(3), (d), (e), 1329, a detailed set of penalties, 8 U.S.C. § 1324(a)(1)(B), (a)(2)–(4), and a specific but limited role for states to play within this scheme, 8 U.S.C. § 1324(c). The transport provisions alone are at least as

42

comprehensive as the several statutes that govern alien registration, *see* 8 U.S.C. §§ 1302–1306, which *Arizona* held established field preemption, 567 U.S. at 401.  And the broader scheme governing entry, residence, and removal—of which the transportation provisions are a part—is significantly more extensive than the registration statutes.

Defendants downplay the dominant federal interests the Supreme Court has repeatedly recognized.  Br. 47–48.  But Section 10 threatens those interests in numerous ways.  Among other things, "[p]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad."  *Arizona*, 567 U.S. at 395.  That is particularly true insofar as Section 10 imposes criminal penalties for driving a covered noncitizen into Florida to go to school, or the hospital, or the grocery store to buy food.  *See, e.g.*, App. 129–30 (hospital and grocery store); App. 143 (church, court, hospitals, and schools).

### B. Section 10 Is Conflict Preempted.

The district court also correctly held that Section 10 is conflict preempted. App. 326–29.  A statute is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up).

As with field preemption, the Court's precedents in *GLAHR* and *Alabama* control this case.  In both of those cases, this Court held that state immigrant

43

transport laws were conflict preempted for two reasons: because they took discretion away from federal officials and instead allowed state officials to enforce immigration law unilaterally, and because they extended beyond federal law, to conduct that Congress had chosen not to penalize. Both of those are equally true of Section 10, if not more so.

1. Section 10 "presents an obstacle to the execution of the federal statutory scheme" because it places enforcement discretion in the hands of the State, not the federal government. *GLAHR*, 691 F.3d at 1265. Indeed, "the broad discretion" delegated to the federal Executive is "[a] principal feature" of the scheme that Congress designed, which allows federal immigration officials to determine whether enforcement best serves national interests. *Arizona*, 567 U.S. at 396; *see also GLAHR*, 691 F.3d at 1265 ("By confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney"); *id.* at 1264 (explaining that, under § 1324(c), "the role of the states is limited to arrest for violations of federal law"). "[F]ederal officials in charge of the comprehensive scheme" decide whether "to bring criminal charges against individuals" under the federal criminal laws, or whether doing so "would frustrate federal policies." *Arizona*, 567 U.S. at 402. But Section 10 provides state officers with discretion to prosecute these crimes unilaterally, with no federal supervision or oversight. *See id.* at 410 (holding that "unilateral" state

44

immigration enforcement is conflict preempted).   For this reason, Section 10 undermines the "broad discretion" Congress entrusted to federal immigration officials.  *Id.* at 396; *see Iowa*, 126 F.4th at 1346 (holding state immigration law conflict preempted for similar reasons).

Section 10 thus "presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration."  *GLAHR*, 691 F.3d at 1265.  While U.S. Attorneys must "exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve," Section 10 is "not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."  *Id.*  Instead, Section 10 allows Florida prosecutors to bring charges "against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Arizona*, 567 U.S. at 402.

Section 10 also identifies a new category of noncitizens—those who have not been inspected since entry, a category that appears nowhere within the INA.  *See supra* Parts B, I.A.ii; App. 99.  As a result, *state* officers will have to decide whether a person's immigration history means that they have been "inspected" since entry, all "without any input from the Federal Government."  *Arizona*, 567 U.S. at 409.  This is another reason for conflict preemption.  *See Villas at Parkside Partners v.*

45

*City of Farmers Branch*, 726 F.3d 524, 531 (5th Cir. 2013) (finding conflict preemption where statute required state officers to make complex immigration determinations).

2.  "The conflict that exists is exacerbated by the inconsistency between [Section 10] and provisions of federal law."  *GLAHR*, 691 F.3d at 1266; *see Alabama*, 691 F.3d at 1287–88 (same).  The inconsistencies here are vast.  Unlike federal law, Section 10 does not require that transportation of the unlawfully present noncitizen be "in furtherance" of the violation of law.  8 U.S.C. § 1324(a)(1)(A)(ii).  Instead, Section 10 bars transport across the board, even for the most innocuous purposes. *See* App. 276–77; *GLAHR*, 691 F.3d at 1265 (finding similar state statute preempted where it lacked the in-furtherance element and criminalized "driving an unlawfully present [noncitizen] to the supermarket").

States cannot countermand Congress's decision here.  Congress "made a deliberate choice not to impose criminal penalties" on transport unless it was "in furtherance of" a noncitizens' unlawful entry or presence. *Arizona*, 567 U.S. at 405 (finding state employment crime conflict preempted on this basis); *see Stonefish*, 402 F.3d at 695 (Congress did not criminalize basic life necessities in § 1324); *Moreno*, 561 F.2d at 1323 (same).  And Congress's entire scheme is designed to ensure that states do not cause the "mistreatment of [noncitizens] in the United States." *Arizona*, 567 U.S. at 395.  As this Court held in *GLAHR* and *Alabama*, state

46

immigration laws that go beyond Congress's carefully tailored approach conflict with federal law.

Section 10 also omits the federal law's exemptions for religious activities, which "clearly poses an obstacle" to Congress's objective "to protect certain religious activities." *Valle del Sol*, 732 F.3d at 1028. Section 10 requires mandatory pre-trial detention, which federal law does not. Fla. Stat. § 787.07; *Arizona*, 567 U.S. at 402–03 (conflict based on "inconsistency . . . with respect to penalties"). And as explained, Section 10 applies to a new, state-created category of noncitizens— those who have not been inspected since entry—which appears nowhere in federal law. These many inconsistencies mean that Section 10 effectively "creates a new crime unparalleled in the federal scheme." *GLAHR*, 691 F.3d at 1266 (conflict preemption on this basis).

Defendants' arguments to the contrary are unpersuasive. Relying again on *Garcia*, Defendants contend that conflict preemption here "would extend to any state law that overlapped with federal law." Br. 49 (citing *Garcia*, 589 U.S. at 212). But Section 10's conflict with federal immigration law is based on much more than the peripheral overlap that was alleged in *Garcia*.

In contrast to the tax withholding crime in *Garcia*, Section 10's purpose, effect, and operative terms apply directly to immigration matters. *Garcia* explicitly did not speak to that situation, since the crime there was "*fundamentally unrelated*"

47

to immigration, 589 U.S. at 208—something that is plainly not true here.  And unlike tax forms, the "entry, movement, and residence of [noncitizens]" involves a number of uniquely federal interests.  *GLAHR*, 691 F.3d at 1264.  Federal officials need to balance multiple competing priorities, like foreign relations, humanitarian considerations, and practical resource constraints.  *Arizona*, 567 U.S. at 396–97, 408 (citing these issues as reasons why unilateral state action is preempted).  Section 10 thus does not merely "overlap to some degree" with federal law.  *Garcia*, 589 U.S. at 211.  Instead, it asserts state control in lieu of Congress's "considered decision" to balance various interests by placing discretion in the hands of federal officials.  *Id.*  "Nothing similar" was present in *Garcia*.  *Id.*  And courts have accordingly rejected attempts to avoid conflict preemption based on *Garcia*.  *See Iowa*, 126 F.4th at 1348–49; *Texas*, 144 F.4th at 685–86.

Defendants also invoke Section 287(g) agreements to argue that Section 10 cannot conflict with federal enforcement discretion.  Br. 48–49.  But Defendants' argument completely misunderstands preemption.  Section 287(g) agreements allow state officers to *assist* in the enforcement of *federal* immigration law, by performing specified immigration "functions" under the Department of Homeland Security's ("DHS") "direction and supervision."  8 U.S.C. § 1357(g)(5), (g)(3); *see GLAHR*, 691 F.3d at 1265.  But nowhere does Section 287(g) allow a "State to achieve its own immigration policy" by creating its own immigration crimes and prosecuting

48

them unilaterally, without any federal direction or supervision. *See Arizona*, 567 U.S. at 408 (relying on 8 U.S.C. § 1357(g)(1) to find preempted a state attempt to create immigration crimes); *see also Texas*, 144 F.4th at 683 (Section 287(g) "is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present"). The district court thus correctly held that Section 10 is conflict preempted.

## III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES.

Defendants barely address the equities—and for good reason. Br. 50–51. The district court correctly found that Plaintiffs would suffer irreparable harm because "[t]he threat of criminal prosecution . . . constitutes irreparable harm." App. 278 (cleaned up). Indeed, this Court has already concluded that plaintiffs who were "under the threat of state prosecution for crimes that conflict with federal law" had shown irreparable harm. *GLAHR*, 691 F.3d at 1268.

By contrast, Florida suffers no comparable harm from being unable to enforce a preempted statute. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law."); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation."). To the contrary, preempted state

49

action injures "the public interest." *Pub. Util. Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 469 (1943).

Defendants' professed interest in addressing a "crisis" falls flat.  Br. 51. "Federal officials of course already enforce immigration law—and many Florida law-enforcement agencies have entered into agreements with [DHS] that allow local police to enforce federal immigration law." *FLIC*, 2025 WL 1625385, at *6; *see* Br. 48 (acknowledging that "[m]any Florida law-enforcement agencies have signed Section 287(g) agreements with the federal government").[10]

Nor does Defendants' invocation of public safety, Br. 50–51, help them. Florida retains full authority to prosecute crimes and drug trafficking under non-immigration laws.  The injunction does not touch that power.  To the contrary, Florida's preempted state immigration scheme will harm public safety by eroding community trust in law enforcement.  *See United States v. Texas*, 719 F. Supp. 3d 640, 698 (W.D. Tex. 2024) ("Because [Texas] SB 4 authorizes state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will

---

[10] Cheryl McCloud, *Florida Leads US in Local Law Enforcement Agencies Partnering with ICE. Check Your County*, Tallahassee Democrat (June 17, 2025), https://perma.cc/TW3C-H5QT.

risk arrest and removal if they report their crimes," making "noncitizen crime victims less likely to report violent crimes.").

While Defendants cite fentanyl concerns, Br. 50-51, the U.S. government confirms that fentanyl is overwhelmingly smuggled at ports of entry by U.S. citizens, not between ports by migrants—so Section 10 is irrelevant to these problems. *See* U.S. Customs & Border Prot., *Frontline Against Fentanyl* (last modified May 22, 2025), https://perma.cc/4NAU-9GSY ("More than 90% of interdicted fentanyl is stopped at Ports of Entry (POEs), where cartels attempt to smuggle it primarily in vehicles driven by U.S. citizens."). More generally, immigrant communities have consistently lower violent and drug crime rates than others. *See, e.g.*, Nat'l Inst. of Just., Dep't of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate* (Sept. 12, 2024), https://perma.cc/GRD7-K7WE.

## CONCLUSION

The Court should affirm the preliminary injunction.

51

Respectfully submitted,

Omar Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org

Paul R. Chavez
Christina LaRocca
AMERICANS FOR IMMIGRANT
JUSTICE
2200 NW 72nd Ave
P.O. Box No 520037
Miami, FL 33152
T: (305) 573-1106
pchavez@aijustice.org
clarocca@aijustice.org

Emma Winger
Michelle Lapointe
AMERICAN IMMIGRATION
COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7552
ewinger@immcouncil.org
mlapointe@immcouncil.org

*/s/ Spencer Amdur*
Spencer Amdur
Hannah Steinberg
Cody Wofsy
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
samdur@aclu.org
hsteinberg@aclu.org
cwofsy@aclu.org
osarabia@aclu.org

Amy Godshall
Daniel B. Tilley
ACLU FOUNDATION OF FLORIDA,
INC.
4343 West Flagler Street, Suite 400
Miami, FL 33134
T: (786) 363-2700
agodshall@aclufl.org
dtilley@aclufl.org

Felix A. Montanez
Preferential Option Law Offices, LLC
P.O. Box 60208
Savannah, GA 31420
(912) 604-5801
felix.montanez@preferentialoption.com

*Counsel for Plaintiffs-Appellees*

52

# CERTIFICATE OF COMPLIANCE

1. This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,913 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Spencer Amdur*
Spencer Amdur

**CERTIFICATE OF SERVICE**

I certify that, on October 15, 2025, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Eleventh Circuit via the Court's CM/ECF document filing system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Spencer Amdur*
Spencer Amdur